UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

GINA SMITH, et al.,

          Plaintiffs,

  v.

COUNTY OF SANTA CLARA, et al.,

          Defendants.

Case No. 5:11-cv-05643-EJD

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 49

Plaintiffs Gina Smith, Laurey Shumaker, and Dagmar Chambers (collectively, "Plaintiffs"),[1] bring this action against the County of Santa Clara ("the County"), and three County employees, Alfonso Banuelos, M.D., Barbara Traw, and Anna Hughes (collectively, "Defendants"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the California Fair Employment and Housing Act ("FEHA"), 42 U.S.C. § 1983, and other related violations.

Presently before the court is Defendants' Motion for Summary Judgment ("Mot."). Dkt. No. 49. Having now carefully reviewed the parties' papers and arguments in conjunction with the record, the court has determined that Defendants are entitled to summary judgment on some, but not all, of Plaintiffs' claims. Thus, Defendants' Motion will be granted in part and denied in part for the reasons explained below.

---

[1] Aida Oliva was also a plaintiff to this action when it was filed. However, Oliva's claims were severed by the court on June 25, 2013. Dkt. No. 36.

United States District Court
Northern District of California

## I.    BACKGROUND

Plaintiffs allege, and Defendants do not dispute, that they are employed as Registered Nurses ("RN") by the County of Santa Clara.  First Am. Compl.  ("FAC") ¶ 26, Dkt. No. 5. Plaintiffs work at the Santa Clara Valley Medical Center ("SCVMC") in the Division of Maternity, specializing in the field of Mother Infant Care at the Mother Infant Care Center ("MICC").  Id.

### A.    The Mother Infant Care Center ("MICC")

The MICC is a postpartum care unit of the SCVMC offering medical treatment to infants and mothers following childbirth.  Nurses in the MICC attend to the unique needs of new mothers and babies, including helping the mother to use the bathroom and bathe, changing the mother's undergarments, performing and assisting with breastfeeding techniques, and cleaning the mother's genital area of blood and other bodily fluids – a technique known as perinatal care.  Decl. of Charles A. Bonner ("C. Bonner Decl.") at Ex. 1, 77:4-78:23, Dkt. No. 63.

RNs employed by the County, including Plaintiffs, are members of the Registered Nurses Professional Association ("RNPA").  Id. ¶ 4.  Like other nurses at SCVMC, MICC nurses are categorized as "per diem," "extra help," or "coded" nurses.  Decl. of Joanne Cox ("Cox Decl.") ¶ 5, Dkt. No. 52.  "Per diem" and "extra help" nurses fill staffing shortages caused by vacations, leaves of absence, and patient fluctuations, and are generally considered at-will employees.  Id. In contrast, "coded" nurses work a minimum set number of hours each pay period, depending on their code,[2] and are entitled to the rights set forth in the RNPA's Agreement with the County.  Id. ¶ 6, Ex. A.

Barbara Traw is the Nurse Manager of the MICC.  Decl. of Karl Sandoval ("Sandoval Decl.") at Ex. A, 71:5-7,  Dkt. No. 51; see FAC ¶ 60.  In her capacity as Nurse Manager, Traw

---

[2] For example, a 1.0 code is considered a full-time position, working 80 hours per two-week pay period.  Cox Dec. ¶ 6.  There are five codes in total, including  ".90" (72 hours per pay period); ".80" (64 hours per pay period); ".60" (48 hours per pay period); and ".50" (20 hours per pay period).  Id.

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   oversees the day-to-day operations of the MICC, assists in the hiring of new staff, handles patient

2   and staff complaints, and participates in disciplinary proceedings.  Id. at Ex. A, 71:7-21.  Nurses in

3   the MICC report to Assistant Nurse Managers, who in turn report directly to Traw.  See id. at Ex.

4   A, 105:3-6.  During the time period relevant to this action, there were three Assistant Nurse

5   Managers for the MICC: Krystal Kajoica during the day, Annabelle Ablan in the evening, and

6   Editha Guiang at night.  Id. at Ex. A, 95:9-12; Ex. F, 42:1-25; 50:19-51:1; Ex. G, 8:19-23.  Each

7   shift also had a designated "charge nurse" who was responsible for overseeing the "workflow" of

8   the shift, including ensuring that nurses take breaks, assigning nurses to newly admitted patients,

9   and setting the assignments for the incoming nurses on the next shift.  Sandoval Decl. at Ex. F,

10  38:3-39:22.

### B.   Personnel Changes and Hiring Male Nurses in the MICC

12       Between 2009 and 2011, the MICC went through at least two rounds of "layoffs," resulting

13  in the transfer of nurses to other positions outside of the MICC or the elimination of their position

14  all together.  See id. at Ex. B, 127:16-128:18.  When Traw became the Nurse Manager of the

15  MICC in 2010, the SCVMC did not employ any male nurses in the MICC, although there were

16  male student nurses who would rotate through the unit.  See id. at Ex. A, 78:24-79:3; Ex. F 146:4-

17  147:7.  According to Plaintiffs, male nursing students typically did not perform the more intimate

18  aspects of care in the MICC, such as checking for vaginal bleeding or conducting breast

19  examinations.  Decl. of Gina Smith ("Smith Decl.") ¶ 7-8, Dkt. No 61; Decl. Dagmar Chambers

20  ("Chambers Decl.") ¶¶ 9-10, Dkt. No. 60.

21       In February 2011, Traw and the Assistant Nurse Managers – Kajoica, Ablan, and Guiang –

22  began interviewing applicants for three "extra help" nursing positions in the MICC.  Id. at Ex. A,

23  82:2-83:24; 94:16-95:8.  With Traw's agreement, the Assistant Nurse Managers extended offers of

24  employment to three male candidates, all of whom were licensed to practice in California by the

25  Board of Registered Nursing.  Id. at Ex. F, 452:3-9; Req. for Judicial Notice ("RJN"), Dkt. No. 50,

26

27

28  Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

1   at Exs. B, C, D.[3]  One of the new male hires was Trent Mikami ("Mikami"), who had previously

2   worked in the MICC as a "special clerk."  <u>See</u> Sandoval Decl. at Ex. F, 148:12-149:4.

3         As discussed in greater detail below, Plaintiffs had concerns regarding the hiring of the

4   male nurses in the MICC, and specifically regarding the hiring of Mikami.  C. Bonner Decl. at Ex.

5   1, 99:7-104:17.

6   **C.      Plaintiff Gina Smith**

7         Smith is an African-American female who is, and at all times relevant to this action was,

8   employed by the County as a registered nurse.  Smith is a 0.5 "coded" employee and works the

9   evening shift in the MICC from 3:00 p.m. to 11:30 p.m.  <u>See</u> Sandoval Decl. at Ex. A, 70:5-7.

10  Smith began working for the County in 1992, and has worked in the MICC since June 2006.

11  Smith Decl. ¶ 2.

12              **i.      Smith Raises Concern Regarding the Hiring of Male Nurses in the MICC**

13        On February 25, 2011, Smith asked Dr. James Byrne, the chief of the Maternal Child

14  Health Division, "what his thoughts were regarding the prospect of male nurses working in the

15  MICC unit as direct caregivers for mothers and babies."  Smith Decl. ¶ 10.  According to Smith,

16  several female patients had conveyed to her that they felt uncomfortable and potentially unsafe

17  with male nurses performing their care.  Sandoval Decl. at Ex. F, 195:15-196:2.  Three days after

18  the conversation, Dr. Byrne wrote an email to the hospital administration stating: "MICC RN Gina

19  Smith asked me what I thought of the prospect of male RN's [sic] being assigned to MICC.  She

20  stated that she was opposed and thought it was wrong to have male RN's [sic] present on her

21  ward."  <u>Id.</u> at Ex. K, 37:2-17; 60:15-23, Ex. 11.

22        On or about March 10, 2011, Traw issued Smith an "Unfavorable Report" based on her

23  comments to Dr. Byrne opposing the hiring of male nurses.  <u>Id.</u> at Ex. A, 157:18-158:2, Ex. 5.

24  The Report stated that that Smith's conduct violated the County's policy against gender

25  discrimination.  <u>Id.</u> at Ex. A, 157:18-158:2; 359:13-19; 378:5-379:11.  As part of the disciplinary

26  ─────────────────

27  [3] Defendants' RJNs are GRANTED to the extent referenced in this Order.  <u>See</u> Fed. R. Evid. 201.

4

28  Case No.: <u>5:11-cv-05643-EJD</u>
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

action in response to this Report, Traw also required Smith to attend a Sexual Harassment and Discrimination training.  Id. at Ex. A at 168:169-4.

### ii.    Smith Raises Concerns Regarding Staffing Assignments, Patient Care, and Racial Favoritism

On January 24, 2011, Smith sent an email to Traw and the Chief Nursing Officer, Trudy Johnson, claiming that she had been denied breaks on January 20, 2011 by Chau Luu, the charge nurse on duty.  C. Bonner Decl. at Ex. 2, 396:24-399:12.  Smith further informed Traw and Johnson that Luu had instructed the MICC nurses "to relieve each other," which she argues "would have resulted in each nurse doubling her patient count" and improper patient to nurse ratios.  Smith Decl. ¶ 28(b), Ex. 6.

On April 4, 2011, Smith sent an email to Traw and Johnson accusing Ablan of racial favoritism.  See Sandoval Decl. at Ex. F, 318:8-12.  Specifically, Smith testified that Ablan gave "special assignments and treatment" to Filipino nurses who were her friends.  Id. at Ex. F, 318:8-12; 324:22-325:2.  About a week later, on April 11, 2011, Smith sent another email to Traw and Johnson complaining of favoritism and racism by Raquel Bautista, the charge nurse on duty the previous day.  Sandoval Decl. at Ex. F, 342:2-19, Ex. 8.  And on May 17, 2011, Smith spoke with Traw about a patient assignment she considered unsafe and claimed that the assignment was racially discriminatory.  Smith Decl. ¶ 28(c).  Specifically, Smith voiced her concern that she had been assigned to six patients, three of whom were classified as "acuity level 3," while other nurses had only "acuity level 2" patients.  Sandoval Decl. at Ex. F, 354:21-355:14.  Traw acknowledged that Smith's complaint regarding this assignment raised issues of patient care and safety. C. Bonner Decl. at Ex. 2, 400:6-401:12.  Traw also stated she received a complaint from the charge nurse on duty that day alleging that Smith had been disruptive and unprofessional.  Traw Decl. ¶ 4, Ex. B, Dkt. No. 53.

Thereafter, on June 8, 2011, Traw issued Smith an "Employee Written Counseling" for violating the County's "Code of Conduct" policy based on the May 17th incident.  See C. Bonner

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Decl. at Ex. 2, 421:1-18; Smith Decl., Ex. 7, Dkt No. 61-7; Sandoval Decl. at Ex. A, Ex. 40; Traw Decl. ¶ 4, Ex. B.   The Written Counseling alleged that Smith was disruptive, repeatedly interrupted the charge nurse, attempted to change patient assignments without supervisor authorization, refused to take breaks at the scheduled time, and failed to use proper communication with her colleagues.  Smith Decl. Ex. 7; Traw Decl. Ex. B.

On July 21, 2011, Smith was reviewing the schedule with Chambers, and believed that Filipino nurses were "more frequently scheduled to relief, resource and charge nurses than nurses of other national origins."  Smith Decl. ¶ 28(d).  Smith raised this concern about the schedule to Ablan, who was in charge of assigning the schedules, and accused her of discrimination.  Id. Smith also alleges that on the same day, she was denied her 15 minute break.  Id. ¶ 28(e).

Thereafter, on or about August 9, 2011, Traw wrote Smith another "Employee Written Counseling" regarding her alleged conduct on July 21st and her failure to improve her behavior generally since the June 8th write-up.  See C. Bonner Decl. at Ex. 2, 421:1-18, Ex. 42.  The Written Counseling accused Smith of continuing to compare scheduling assignments, exhibiting "inappropriate behavior" toward her charge nurse, and failing to take breaks at the scheduled time, among other allegations.  Id.; Smith Decl. ¶ 28(c), Ex. 8, Dkt. Nos. 61-8, 61-9.  The write-up initially included a paragraph accusing Smith of failing to perform routine duties regarding a "C-section" patient, but Traw later deleted this paragraph after she "went back re-talked to the nurse who had made these statements," and the nurse was "no longer willing to back them up." C. Bonner Decl. at Ex. 2, 421:1-18, 423:17-426:12, Exs. 41, 42; Sandoval Decl. at Ex. A, 421:1-18, 425:14-426:12, Ex. 41.  Traw testified that the Written Counseling was not a formal write-up, but rather was a "plan of correction," intended only as a talking point for improving Smith's allegedly inappropriate behavior.  Sandoval Decl. at Ex. A, 422:3-423:13.  The write-up was kept as part of Traw's file on Smith.  Id.

### iii.   Smith is Accused of Committing a HIPAA Violation

On or about August 18, 2011, Smith made a complaint of discrimination to Vernon

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Crawley, a representative of the Equal Opportunity Division ("EOD"), regarding the allegedly unsafe patient staffing in the MICC. Sandoval Decl. at Ex. I, 17:13-18, Dkt. No. 51-9. In support of her concerns, Smith took an assignment sheet identifying the acuity level of patients in the MICC and showed the document to Crawley. Id. at Ex. I, 17:13-18:21. In September 2011, Traw reported this disclosure as a potential HIPAA violation to Hughes, the Compliance and Privacy Officer for the County's Health and Hospital System. Id. at Ex. A, 429:1-430:20; Ex. D, 201:4-202:8, Dkt. No. 51-4. Hughes investigated and concluded that Smith's actions violated HIPAA on or about October 20, 2011. Id. at Ex. D, 208:12-19; 209:20-210:19.

Smith filed complaints with the Equal Employment Opportunity Commission ("EEOC") on August 19, 2011 and the Department of Fair Employment and Housing ("DFEH") on November 9, 2011. Id. at Ex. F, 434:12-24, Exs. 11, 21.

### D.    Plaintiff Dagmar Chambers

Chambers is a European-American female who has been a County employee since February 1992 and began working in MICC in 2006. Chambers Decl. ¶ 2.

#### i.    Chambers Raises Concerns Regarding the "Misuse of Public Money" and, In Particular, the Hiring of Trent Mikami in the MICC

On February 11, 2011, Chambers received an email from Johnson regarding issues related to the hospital budget and "inviting employee input." Chambers Decl. ¶ 3, Ex. 1. Chambers responded to the email, stating that she believed there to be "corruption" and mismanagement of taxpayer money occurring in the MICC. Id.; Sandoval Decl. at Ex. H, 307:2-4, Ex. 11. Specifically, Chambers claimed that Traw hired Mikami as an "extra help" clerk without properly posting the position and sent him to a paid two-day breastfeeding class, which she thought was a misuse of public grant money. Sandoval Decl. at Ex. H, 307:5-308:10, Ex. 11. Johnson indicated that she would look into the process through which Mikami was hired to "ensure everything is done fairly…and that he is not getting special treatment," but that it was "not a problem" for an employee to attend a paid breastfeeding class." Sandoval Decl. at Ex. E, 52:7-53:9. Johnson also

United States District Court
Northern District of California

testified that she did not share further information with Chambers because it was confidential employment information.  Id.

In mid-February 2011, Chambers was involved in a conversation with other MICC nurses regarding the implications of hiring male nurses in the MICC.  Chambers Decl. ¶¶ 13-15.  Among the concerns was the impact on patient care and safety.  Id.  Thereafter, Guiang reported Chambers for allegedly saying that she would not help male nurses if they were hired.  Sandoval Decl. at Ex. A, 112:7-11, Ex. 1; 125:14-17; 143:8-20, Ex. 4.  Chambers disputes having made this comment. Id. at Ex. A, 112:7-11, Ex. 1; Chambers Decl. ¶¶ 17-19.  On March 2, 2011, Chambers states that she attempted to speak to Johnson regarding her concerns about hiring male nurses in the MICC and its impact on patient care, but that when she raised the issue, Johnson put her hand up and said "that is sexual harassment, sex discrimination…stop…stop!"  Chambers Decl. ¶ 15.  Chambers asserts that Johnson repeated this several times when other MICC nurses brought up the topic.  Id. On March 8, 2011, Traw issued Chambers an "Unfavorable Report" based on the comments she allegedly made regarding the male nurses, stating that Chambers had engaged in gender discrimination and sexual harassment.  Sandoval Decl. at Ex. A, 112:7-11, Ex. 1; Chambers Decl. ¶ 18.  Traw instructed Chambers not to discuss the write-up with anyone.  Chambers Decl. ¶ 18.

### ii.     Chambers is Investigated for Involvement in a Potential a HIPAA Violation

In late October 2011, Hughes commenced an investigation into an alleged HIPAA and privacy violation.  On or around October 24-26, 2011 County employee Sylvia Gallegos stayed in the MICC where she was adopting a newborn baby.  Chambers Decl. ¶ 30.  To accommodate Gallegos, another patient was moved out of a private room.  C. Bonner Decl. Ex 1, 180:1-181:8. Some MICC nurses were upset about this and expressed concern that a County executive was being given special treatment at the expense of other patients and taxpayers.  Id. at Ex. 1, 180:1-187:5; Sandoval Decl. at Ex. D, 117:2-118:5.

On October 26, 2011, the County received an email from a *San Jose Mercury News* reporter requesting a comment regarding a "tip" that Sylvia Gallegos was adopting a baby and was

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

United States District Court
Northern District of California

being given special treatment by way of a multi-night stay in a private room at taxpayers' expense. Sandoval Decl. at Ex. D, 57:13-60:9, Ex. 3.  The reporter included dates of hospitalization and reference to the specific room number.  Id. at Ex. D, 57:13-24, Ex. 3.  The reporter subsequently published an article disclosing that information.  See id. at Ex. A, 201:11-12; Chambers Decl. ¶ 34, Ex. 3A.  Consequently, Hughes initiated an investigation into the disclosure.

Hughes' investigation included interviewing fourteen MICC employees who had potentially come into contact with Gallegos, including Chambers.  Sandoval Decl. at Ex. D, 116:17-117:1; 119:15-16.  One nurse purportedly claimed that Chambers told her she had disclosed the information to the reporter.  Id. at Ex. D, 202:16-204:17.  Hughes interviewed Chambers and she denied having disclosed the information.  Id. at Ex. D, 168:5-24.  Hughes states that she did not believe Chambers based on the testimony of other nurses and Chambers' statements during her interview.  Id. at Ex. D, 168:25-169:6; 171:1- 21; 178:14-179:16.

Chambers was then placed on paid administrative leave from November 2011 to May 2012 pending completion of Hughes' investigation.  Id. at Ex. H, 257:19-258:16, Ex. 9; Chambers Decl. ¶¶ 36-38; C. Bonner Decl. at Ex 1, 205:12-206:19.  During that time, Chambers was ineligible for transfers or promotions. Chambers Decl. ¶¶ 36-38, Ex 4.  Hughes later concluded that Chambers was the source of disclosure and Chambers was issued a formal "Employee Written Counseling" on May 23, 2012 and given a "bad Evaluation" by Traw.  Sandoval Decl. at Ex. D, 304:20-306:16; Ex. H, 117:6 - 118:21, Ex. 3; Chambers Decl. ¶¶ 38, 40, Ex. 5.

### iii.    Chambers' Requested Schedule Modification Is Denied

Just before being placed on administrative leave in November 2011, Chambers requested a modification to her regular schedule that would allow her to work an extra day during the week of November 14, 2011, and then take an additional day off on Thursday November 17, 2011 for the Thanksgiving holiday.  Chambers Decl. ¶ 48.  This request was approved and Chambers was scheduled to work nine days, beginning Tuesday November 8, 2011 through November 16, 2011. Id.

United States District Court
Northern District of California

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

However, on November 11, 2011, Ablan told Chambers that Traw denied the request, and Chambers was no longer permitted to work that Monday because it would require her to work eight days in a row.  Id.  Traw states that she denied the request because she "believed it to be unsafe for nurses to work more than eight days in a row."  Traw Decl. ¶ 6.  But Chambers asserts that she had previously worked more than eight days on a regular basis, including the prior month wherein she had worked ten days in a row between August 30, 2011 and September 8, 2011.  Chambers Decl. ¶ 49.  Chambers also contends that she has continued to work for as many as ten days in a row since that time.  Id.

Chambers filed complaints with the DFEH alleging discrimination, retaliation, and harassment on the basis of race and gender on November 17, 2011 and December 2, 2011.  Sandoval Decl. at Ex. H, 453:24-454:12, Ex. 17; 466:10-466:25, Ex. 18.

### E.    Plaintiff Laurey Shumaker

Like Smith and Chambers, Shumaker is, and at all times relevant to this action was, employed by the County as a registered nurse.  Declaration of Laurey Shumaker ("Shumaker Decl.") ¶ 2, Dkt. No. 62; Sandoval Depo. at Ex. B, 15:14-17; 16:3-4; FAC ¶ 57.  Shumaker worked the evening shift as a "0.5 coded" nurse and was assigned to the MICC from September, 2001, when she became a county employee, through February 2011, when she left on extended disability leave.  Sandoval Depo. at Ex. B, 16:12-21; 26:7-17; 31:21-32:7; Shumaker Decl. ¶ 13.

### i.    Shumaker's RNPA Union Activity and "Administrative Transfer" to the Night Shift

Shumaker was also the nurses' RNPA union representative from 2006 to 2011.  Shumaker Decl. ¶ 3; Sandoval Decl. at Ex. B, 122:6-7.  In that position, Shumaker was a vocal advocate for other nurses and, in 2010, actively opposed the transfers and layoffs occurring in the MICC.  Shumaker Decl. ¶ 4; Sandoval Decl. at Ex. B, 123:5-124:14;127:16-128:18.  Specifically, Shumaker believed that the proposed personnel changes would have left SCVMC out of compliance with state mandated nurse-to-patient ratios.  Shumaker Decl. ¶ 4; Sandoval Decl. at

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    Ex. B, 123:5-124:14;127:16-128:18.  To that end, Shumaker organized and encouraged other

2    nurses to fill out forms regarding the non-compliant ratios for the RNPA union, which the RNPA

3    in turn presented to the County Board of Supervisors at a meeting in or about January, 2011.

4    Shumaker Decl. ¶¶ 4-6; Sandoval Decl. at Ex. B, 123:5-124:14; 127:16-128:18.

5          In January 2011, the Board decided to eliminate the equivalent of 2.6 full-time positions

6    from the MICC.  Cox Decl. ¶ 7.  Pursuant to the RNPA Agreement's provisions governing layoffs,

7    the 2.6 positions to be eliminated were those positions held by the nurses with the least seniority.

8    Id., Ex. A, section 5.4-5.5.  Shumaker was not one of the nurses laid off.  Id.; Sandoval Decl. at

9    Ex. B, 131:23-24.  However, on January 28, 2011, Traw sent Shumaker a letter advising her that

10   beginning on February 9, 2011, she would be "administratively transferred" from the evening shift

11   (3:00 p.m. to 11:00 p.m.) to the night shift (11:00 p.m. to 7:00 a.m.).  Shumaker Decl. ¶ 7;

12   Sandoval Decl. at Ex. B, 141:15-142:3, Ex. 5.  Traw testified that this transfer was necessary

13   because the layoffs left the night shift understaffed. Sandoval Decl. at Ex. B, 534:20-537:11, Ex.

14   67; 538:2-539:7, Ex. 68; 540:12-18, Ex. 69.  And because Shumaker occupied the lowest code

15   (0.5) and had the least seniority on the evening shift, she was administratively transferred to the

16   night shift.  Id.

           ii.     **Shumaker's Medical Disability and Request for Accommodation**

17

18         Upon receiving the notice of transfer letter, Shumaker contacted Johnson and Traw

19   expressing her concern to that, unlike other coded employees who were administratively

20   transferred, she had not been provided with sufficient notice of this change.  Shumaker Decl. ¶ 8;

21   Sandoval Decl. at Ex. B, at 154:6-25.  In response, Johnson and Traw agreed to provide her with

22   an additional ten days before her transfer went into effect.  Sandoval Decl. at Ex. B, 154:6-25; Ex.

23   A, 487:3-488:18.

24         However, on February 22, 2011, Shumaker was placed on medical disability by her

25   primary care doctor due to a diagnosed sleep disorder that prevented her from being able to work

26   the night shift.  Shumaker Decl. ¶¶ 10, 11, 18, Exs. 9, 10, 15, 17, 18.  On March 31, 2011,

27

28   Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Shumaker made a reasonable accommodation request to transfer to evening or dayshift anywhere

2   in the Santa Clara County system, however, the County indicated that there were no positions

3   available to accommodate her. [4]  Id. at ¶¶ 11-12.  Shumaker contends that other nurses of a

4   different race and gender from her were assigned to the evening shift following her

5   accommodation requests, which she argues undermines Defendants' letter stating that no

6   accommodation existed.  FAC ¶ 61.  Shumaker remained on medical leave from February 23,

7   2011 until January 14, 2013, when the County was able to accommodate her and she began work

8   at the Tully Clinic.  Sandoval Decl. at Ex. B, 20:1-7; 15:14-19.

9       Shumaker filed complaints with the DFEH and EEOC on October 17, 2011 alleging

10  discrimination, retaliation, and harassment on the basis of race, gender, age, and disability.

11  Sandoval Decl., Exs. L, M.

12  **II.     LEGAL STANDARD**

13      A motion for summary judgment or partial summary judgment should be granted if "there

14  is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

15  law."  Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

16      The moving party bears the initial burden of informing the court of the basis for the motion

17  and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions,

18  or affidavits that demonstrate the absence of a triable issue of material fact.  Celotex Corp. v.

19  Catrett, 477 U.S. 317, 323 (1986).  If the issue is one on which the nonmoving party must bear the

20  burden of proof at trial, the moving party need only point out an absence of evidence supporting

21  the claim; it does not need to disprove its opponent's claim.  Id. at 325.  If the moving party meets

22  the initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and

23  designate specific materials in the record to show that there is a genuinely disputed fact.  Fed. R.

24  _____

25  [4] In an April 22, 2011 email from Traw regarding Shumaker's request for accommodation, Traw
    wrote: "Laurey Shumaker's code was an administrative transfer from PM shift to night shift due to
26  the budget reduction/layoffs in February of 2011. MICC does not have a vacant 0.5 code on the
    PM shift.  The 0.5 positions and code were transferred to night shift due to budget reductions."
27  Sandoval Decl. at Ex. B, 534:20-537:11, Ex. 67; 538:2-539:7, Ex. 68; 540:12-18, Ex. 69.

12

28  Case No.: 5:11-cv-05643-EJD
    ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT

1    Civ. P. 56(c); Celotex Corp., 477 U.S. at 324.

2        A "genuine issue" for trial exists if the non-moving party presents evidence from which a

3    reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the

4    material issue in his or her favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

5    The court must draw all reasonable inferences in favor of the party against whom summary

6    judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

7    However, the mere suggestion that there are facts in controversy, as well as conclusory or

8    speculative testimony in affidavits and moving papers, is not sufficient to defeat summary

9    judgment.  Id. ("When the moving party has carried its burden under Rule 56(c), its opponent must

10   do more than simply show that there is some metaphysical doubt as to the material facts.");

11   Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).  Instead, the non-moving

12   party must come forward with admissible evidence to satisfy the burden.  Fed. R. Civ. P. 56(c).

13       The principles of summary judgment apply equally in discrimination cases.  Steckl v.

14   Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983).  General assertions that a defendant had a

15   discriminatory motive or intent in taking an adverse action are insufficient to defeat summary

16   judgment unless supported by substantial factual evidence.  Id.  Adetuyi v. City & Cty. of San

17   Francisco, 63 F. Supp. 3d 1073, 1080 (N.D. Cal. 2014) ("A party cannot defeat a motion for

18   summary judgment by offering 'purely conclusory allegations of alleged discrimination, absent

19   concrete particulars ..., for to do so would necessitate a trial in all Title VII cases.") (citing

20   Candelore v. Clark Cnty. Sanitation Dist., 975 F.2d 588, 591 (9th Cir. 1992)).

21       "If the nonmoving party fails to produce enough evidence to create a genuine issue of

22   material fact, the moving party wins the motion for summary judgment."  Nissan Fire & Marine

23   Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).  "But if the nonmoving party

24   produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats

25   the motion."  Id.

26

27

28

United States District Court
Northern District of California

III.     DISCUSSION

A.     Evidentiary Objections

Defendants submitted a list of objections to the declarations submitted by Plaintiffs in opposition to the motion.  These evidentiary objections are misplaced.

Under Rule 56, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2). Consequently, the focus of an objection at the summary judgment stage is not "the admissibility of the evidence's form" but on the "admissibility of its contents."  Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).  In consideration of the applicable standard, "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are unnecessary. Burch v. Regents of the Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. June 5, 2006).  So too are objections based on the best evidence rule, or which assert that a declarant's statement was made without personal knowledge, "lacks foundation," or is given in the form of a legal conclusion.  Alvarez v. T-Mobile USA, Inc., No. CIV. 2:10-2373 WBS, 2011 WL 6702424, at *3-4 (E.D. Cal. Dec. 21, 2011).  "Instead of challenging the admissibility of this evidence, lawyers should challenge its sufficiency."  Id.  Defendants objections made on any of these ground are overruled.

Defendants have also objected to certain statements as contradictory of deposition testimony, and have objected to certain declarations as either untimely under Civil Local Rule 5-1(e)(4) or as offered by witnesses who were not disclosed by Plaintiffs according to Federal Rule of Civil Procedure 26.  These objections are not evidentiary in nature despite the label Defendants have applied to them and are overruled on that basis.

What remains are objections based on hearsay.  Because the court will not rely on the particular evidence objected to by Defendants, the hearsay objections are overruled as moot.

United States District Court
Northern District of California

## B.     Exhaustion of Administrative Remedies for Age Discrimination Claims

As an initial matter, Defendants contend that Smith and Chambers failed to include allegations of age discrimination in their EEOC and DFEH complaints, and consequently are barred from bringing claims based on age discrimination in this court.  Mot. at 21.

Under both Title VII and FEHA, an employee-plaintiff alleging discrimination must exhaust his or her administrative remedies prior to bringing a civil action in court by filing a timely charge with the appropriate administrative agency.  Lyons v. England, 307 F.3d 1092, 1104 (9th Cir. 2002) ("To establish federal subject matter jurisdiction, a plaintiff is required to exhaust his or her administrative remedies before seeking adjudication of a Title VII claim."); Okoli v. Lockheed Tech. Operations Co., 36 Cal. App. 4th 1607, 1613 (1995) ("[I]n the context of the FEHA, exhaustion of the administrative remedy is a jurisdictional prerequisite to resort to the courts.").  For Title VII claims, this means that an employee must first file a complaint with the EEOC, and for FEHA claims, it means an employee must first file a complaint with the DFEH.  Leland v. City & Cty. of San Francisco, 576 F. Supp. 2d 1079, 1090 (N.D. Cal. 2008).  The scope of a subsequent civil action is confined by the scope of the administrative complaint.  Accordingly, "unlawful conduct not included in an administrative complaint is not considered by a court unless the conduct is like or reasonably related to the allegations in the administrative complaint, or can reasonably be expected to grow out of an administrative investigation."  Id.

Here, Smith and Chambers allege that the County violated Title VII and FEHA by discriminating against them on the basis of age in their First, Fourth, Fifth, and Eighth causes of action.  FAC ¶¶ 78-81; 90-93; 94-98; 111-116.  Smith and Chambers admit that they failed to expressly include age discrimination in their respective administrative complaints, but argue their claims are not precluded on exhaustion grounds for two reasons.  First, they contend that pursuant to the Ninth Circuit's decision in Bak v. Postal Serv., (U.S.), 52 F.3d 241, 244 (9th Cir. 1995), a claimant is no longer required to exhaust his or her administrative remedies prior to filing a civil action for age discrimination.  Opp. at 23.  Alternatively, they contend that even if age

1    discrimination claims are not exempt from the exhaustion requirement, their age discrimination

2    claims are nevertheless "like or reasonably related" to the other allegations of discrimination

3    contained in the administrative complaints.  Opp. at 24.  Each argument will be addressed in turn.

4         Turning to the first argument, Smith and Chambers' reliance on <u>Bak</u> is misplaced.  Unlike

5    in <u>Bak</u>, where the plaintiff filed an age discrimination claim pursuant to the Age Discrimination in

6    Employment Act ("ADEA"), 29 U.S.C. § 621, Smith and Chambers bring their age discrimination

7    claims pursuant to Title VII and FEHA.  Under the ADEA, a complainant may proceed directly to

8    federal court after giving the EEOC notice of intent to sue.  29 C.F.R. § 1614.201.  This is not true

9    of claims brought under Title VII or FEHA.  Indeed, the Ninth Circuit specifically distinguished

10   age discriminations brought pursuant to the ADEA from claims brought pursuant to Title VII in

11   <u>Bankston v. White</u>, explaining that "[u]nlike Title VII … the ADEA 'contains no express

12   requirement that a federal employee complainant seek administrative relief.'"  345 F.3d 768, 770

13   (9th Cir. 2003) (quoting <u>Stevens v. Dep't of Treasury</u>, 500 U.S. 1, 12, (1991) (Stevens, J.,

14   concurring and dissenting).  Therefore, while age discrimination claims brought under the ADEA

15   are "not subject to any administrative exhaustion requirement," age discrimination claims brought

16   under Title VII and FEHA still are.  Accordingly, the court finds that Smith and Chambers were

17   required to exhaust their administrative remedies prior to filing a civil action for age

18   discrimination in this court.

19        Because there is no dispute that Smith and Chambers failed to exhaust their age

20   discrimination claims through the appropriate administrative processes, the remaining question is

21   whether the claims nevertheless are "like or reasonably related" to the allegations contained in

22   their respective administrative complaints.  <u>See</u> <u>Leland,</u> 576 F. Supp. 2d at 1090; <u>Lyons v.</u>

23   <u>England</u>, 307 F.3d 1092, 1104 (9th Cir. 2002) ("Incidents of discrimination not included in an

24   EEOC charge may not be considered by a federal court unless the new claims are like or

25   reasonably related to the allegations contained in the EEOC charge." (quoting <u>Green v. Los</u>

26   <u>Angeles County Superintendent of Sch.</u>, 883 F.2d 1472, 1475–76 (9th Cir. 1989).

27                                                    16

28   Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

1    Defendants argue that Smith and Chambers' age discrimination claims "necessarily

2    involve different arguments and evidence than their retaliation and race and gender-discrimination

3    claims," and consequently are not "like or reasonably related" to such claims.  Def. Reply in

4    Support of Mot. to Dismiss ("Reply") at 13-14, Dkt. No. 66.  The court agrees that Plaintiffs have

5    failed to demonstrate why an investigation regarding discrimination on the basis of race and

6    gender would reasonably trigger an investigation into discrimination on the basis of age.  See

7    Stallcop v. Kaiser Found. Hosps., 820 F.2d 1044, 1050 (9th Cir. 1987) (holding that allegations of

8    sex and age discrimination in civil complaint were not encompassed by the charge filed with the

9    DFEH alleging only national origin discrimination).

10    However, Smith presents additional evidence that she included "age" in her complaint

11    because she checked the box for "age" on her EEOC intake questionnaire.  Smith Decl. ¶ 31, Ex.

12    16.  Accordingly, she argues that her age discrimination claim "would have been discoverable"

13    during an investigation of her claims and should not be barred for failure to exhaust.  Opp. at 24.

14    Smith's position is persuasive.  In B.K.B. v. Maui Police Department, the Ninth Circuit held that if

15    the charge is deficient in recording the complainant's theory of the case due to error of an agency

16    representative, "then the plaintiff may present her pre-complaint questionnaire as evidence that her

17    claim for relief was properly exhausted."  276 F.3d 1091, 1102 (9th Cir. 2002); see also Cheek v.

18    W. & S. Life Ins., Co., 31 F.3d 497, 502 (7th Cir. 1994) (finding that "[a]llegations outside the

19    body of the charge may be considered when it is clear that the charging party intended the agency

20    to investigate the allegations"); Sickinger v. Mega Systems, Inc., 951 F. Supp. 153, 157-58 (N.D.

21    Ind. 1996) (holding that plaintiff could rely upon allegations made in her pre-complaint

22    questionnaire for purposes of exhaustion where the EEOC representative failed to include

23    allegations of wrongful retaliation that were presented on the questionnaire).

24    Here, Smith checked boxes on her EEOC intake questionnaire form indicating that she

25    believed that she had been subjected to discrimination based on "race," "sex," "age," and "national

26    origin."  Smith Decl. ¶ 31, Ex. 16.  Liberally construed, it is reasonable to interpret Smith's EEOC

27

28

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

United States District Court
Northern District of California

1  intake questionnaire as evidence that she intended her right to sue letter to encompass an age

2  discrimination claim.  In light of this, the court concludes that Smith properly exhausted her

3  administrative remedies and is not barred from raising allegations of age discrimination in this

4  case.

5        In contrast, Chambers has not presented any evidence suggesting that she intended to

6  include age discrimination in her administrative charges.  Nor has she demonstrated why her age

7  discrimination claim would be related to or encompassed by an investigation of the other

8  discrimination allegations in her EEOC or DFEH complaints.  See Stallcop, 820 F.2d at 1050.

9  Consequently, Chambers failed to properly exhaust her administrative remedies.  Therefore,

10  Defendants' motion is GRANTED to the extent that the Fourth and Eighth causes of action are

11  based on allegations of age discrimination by Chambers.

12      **C.**    **Discrimination and Retaliation Under Title VII and FEHA**

13        Title VII makes it unlawful for an employer to "discriminate against any individual with

14  respect to [her] compensation, terms, conditions, or privileges of employment, because of such

15  individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  Similarly, FEHA

16  prohibits employment discrimination, in relevant part, on the basis of race, medical condition,

17  gender, or age.  Cal. Gov't Code § 12940(a).  Title VII and FEHA also prohibit an employer from

18  retaliating against an individual because he or she has made a charge of discrimination or opposed

19  a discriminatory practice.  42 U.S.C. § 2000e–3; Cal. Gov't Code § 12940(h).

20        To prevail on a discrimination claim under Title VII, the plaintiff bears the initial burden of

21  establishing a prima facie case of discrimination.  Texas Dept. of Cmty. Affairs v. Burdine, 450

22  U.S. 248, 252-53 (1981).  If the plaintiff succeeds in making a prima facie case, the burden shifts

23  to the defendant "to articulate some legitimate, nondiscriminatory reason" for the allegedly

24  discriminatory conduct.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the

25  defendant meets this burden, the responsibility shifts back to the plaintiff to prove that the reasons

26  offered by the defendant were pretext for discrimination.  Id. at 804; Burdine, 450 U.S. at 253.

27

28
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

United States District Court
Northern District of California

1    This burden-shifting analysis for Title VII discrimination claims also applies to

2    discrimination and retaliation claims made pursuant to FEHA.  See e.g., Guz v. Bechtel Nat. Inc.,

3    24 Cal.4th 317, 354 (2000) (discrimination under FEHA); Yanowitz v. L'Oreal USA, Inc., 36 Cal.

4    4th 1028, 1042 (2005) (retaliation under FEHA).  Accordingly, Plaintiffs' Title VII and FEHA

5    claims will be addressed together using the same legal framework.  Metoyer v. Chassman, 504

6    F.3d 919, 941 (9th Cir. 2007); see also L.A. County Dept. v. Civil Service Comm'n, 8 Cal. App.

7    4th 273, 280 (1992) (explaining that in employment discrimination cases, California courts

8    commonly adopt the standards used in proving intentional discrimination under Title VII); Guz,

9    24 Cal. 4th at 354 (same).

10              **i.    Prima Facie Case**

11    All Plaintiffs claim that Defendants' violated Title VII and FEHA by discriminating

12    against them on the basis of race and gender.  Smith and Shumaker also claim discrimination

13    based on age.  Additionally, Shumaker claims discrimination due to her medical condition.

14    Plaintiffs bring their discrimination claims under both disparate impact and disparate treatment

15    theories of liability.[5]

16              To establish a prima facie case of employment discrimination through disparate treatment,

17    a plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination."

18    Burdine, 450 U.S. at 253.  This inference arises if the plaintiff can demonstrate that she

19    (1) belongs to a protected class; (2) was performing her job satisfactorily; (3) was subjected to an

20    adverse employment action; and (4) was treated less favorably than other similarly situated

21    individuals outside of her protected class.  Cornwell v. Electra Central Credit Union, 439 F.3d

22    _____

23    [5] Employment discrimination claims may be pursued in one of two ways: "An individual may
24    allege that [she] has been subjected to 'disparate treatment' because of [her] [protected status], or
      that [she] has been the victim of a facially neutral practice having a 'disparate impact' on [those
      sharing the same protected status]."  Levy v. Regents of Univ. of California, 199 Cal. App. 3d
25    1334, 1343 (1988) (quoting Furnco Construction Corp. v. Waters 438 U.S. 567, 582, (1978).
      Disparate treatment occurs "when [a person] is singled out and treated less favorably than others
26    similarly situated" on account of a protected characteristic.  Leland, 576 F. Supp. 2d at 1094
27    (quoting Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006)).

28    Case No.: 5:11-cv-05643-EJD
      ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
      SUMMARY JUDGMENT

1018, 1028 (9th Cir. 2006); <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Levy</u>, 199 Cal. App. 3d at 1343.

Plaintiffs further allege that Defendants retaliated against them in violation of FEHA for engaging in protected activity. To state a prima facie case of retaliation, plaintiff must show that (1) she was engaged in protected activity; (2) that defendant took an adverse employment action; and (3) a "causal link between the protected activity and the adverse employment action." <u>Cornwell</u>, 439 F.3d at 1034-35; <u>Lelaind</u>, 576 F. Supp. 2d at 1094.

Although the plaintiff generally bears the initial burden of establishing a prima facie case of discrimination or retaliation, "[w]hen an employer moves for summary judgment ... the burden is reversed because the defendant who seeks summary judgment bears the initial burden." <u>Dep't of Fair Employment & Hous. v. Lucent Techs., Inc.</u>, 642 F.3d 728, 745 (9th Cir. 2011) (internal quotations omitted). Therefore, to prevail on summary judgment, a defendant-employer must demonstrate *either* that the plaintiff failed to establish a necessary element of the prima facie case, or that there was a legitimate, nondiscriminatory reason for the adverse employment action. <u>Id.</u>; <u>Avila v. Cont'l Airlines, Inc.</u>, 165 Cal. App. 4th 1237, 1247-48 (2008).

Regarding the claims made under Title VII and FEHA, Defendants only challenge Plaintiffs' prima facie case as to (1) Shumaker's claim for discrimination based on medical condition, (2) Shumaker and Chambers' FEHA retaliation claims; and (3) all Plaintiffs' disparate impact claims. With respect to the remaining allegations, Defendants proceed directly to arguing that there were legitimate, nondiscriminatory reasons for Defendants' actions. Mot. at 17-20. In the interest of clarity, the court will first address Defendants' prima facie challenges to Plaintiffs' case before moving to the remaining burden shifting analysis.

### a. Shumaker's Claim of Discrimination Based on Medical Condition

It is uncontested that Shumaker's medical condition is a protected characteristic under FEHA, that she was qualified for her position, and that she suffered an adverse employment action in the form of an administrative transfer. However, Defendants allege that they are entitled to summary judgment on Shumaker's medical discrimination claim based on the undisputed fact that

20

1    the County had no prior knowledge of her condition when they administratively transferred her to

2    the night shift.  Mot. at 12-13.  Without prior knowledge, Defendants argue that they could not

3    have discriminated against Shumaker on this basis.  Id.  Defendants cite to Shumaker's deposition,

4    in which she testified that she never mentioned her sleep disorder prior to receiving the

5    administrative transfer letter on January 28, 2011.  Sandoval Decl. at Ex. B, 160:2-9.  Although

6    Shumaker's physician provided multiple notes to Defendants regarding her sleep disorder, the

7    notes were sent after Defendants provided notice of the administrative transfer on January 28,

8    2011.  See Shumaker Decl., Ex. 9 (dated February 14, 2011); Ex. 10 (dated March 31, 2011); Ex.

9    15 (dated July 7, 2011); Ex. 17 (dated September 15, 2011); Ex. 18 (dated March 3, 2011).

10          The court agrees with Defendants that an employee cannot establish a prima facie case of

11   discrimination based on medical condition under FEHA in the absence of evidence that the

12   employer knew the employee had a medical condition.  Trop v. Sony Pictures Entm't Inc., 129

13   Cal. App. 4th 1133, 1145-46 (2005) (affirming summary judgment on a claim for sex

14   discrimination based on pregnancy where there existed no credible evidence that the employer

15   knew the employee was pregnant).  If a condition giving rise to a protected classification is

16   "apparent," or where the "plaintiff alleges that she has disclosed it to the employer, then a question

17   of the employer's knowledge would likely preclude summary judgment."  Id. at 1145 (quoting

18   Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996)).  However, "if the

19   [condition] is not apparent and the employee has not disclosed it to her employer, she must allege

20   knowledge and present, as part of her prima facie case, evidence from which a rational jury could

21   infer that the employer knew" that she had the medical condition that she alleges she was

22   discriminated based on.  Id.  Because Shumaker fails to show that Defendants had any knowledge

23   of her medical condition during the relevant timeframe, she cannot establish a prima facie case for

24   discrimination.  Accordingly, Defendants' motion for summary judgment is GRANTED as to

25   Shumaker's claim of discrimination based on her medical condition.

26

27
                                                    21
28   Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

### b. Shumaker and Chambers' FEHA Retaliation Claims

FEHA makes it an unlawful employment practice "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." Cal. Gov't Code § 12940(h).

As an initial matter, Defendants challenge both Shumaker and Chambers' prima facie case of retaliation by arguing that they did not engage in any protected activity under FEHA *prior* to suffering an adverse employment action, and therefore there is no causal connection between the activity and the allegedly adverse action.[6]  Mot. at 14; See Cornwell, 439 F.3d at 1034-35 (a prima facie case of retaliation requires a plaintiff to demonstrate: (1) a protected activity; (2) an adverse employment action; and (3) a causal link between the two).  Specifically, Defendants point out as to Chambers that the HIPAA investigation and the publication of the MICC nurses' schedules, which included the fact that she was attending sexual harassment training, occurred before she filed her EEOC and DFEH complaints.  Id.  Similarly as to Shumaker, Defendants highlight that Shumaker's administrative transfer to the night shift took place before she filed her EEOC and DFEH complaints.  Id.

While Defendants are correct in stating that these employment actions pre-date the filing of Shumaker and Chambers' respective administrative complaints,[7] Defendants' argument is premised on the assumption that filing these complaints was the only protected activity Plaintiffs

---

[6] The instant motion does not assert a prima facie challenge to Smith's claim of retaliation.  See Mot. at 13.

[7] Chambers was investigated for a HIPAA violation in October 2011 and placed on administrative leave in November 2011.  Sandoval Decl. at Ex. H, 257:19-258:16, Ex. 9; Chambers Decl. ¶¶ 36-38; C. Bonner Decl. at Ex 1, 205:12-206:19.  Traw posted the nurses' work schedules - including information that Chambers was attending sexual harassment training - on August 22, 2011, September 19, 2011, October 17, 2011, and November 14, 2011.   FAC ¶ 75. Chambers filed EEOC and DFEH complaints on November 17, 2011 and December 2, 2011.  Sandoval Decl. at Ex. H, 453:24-454:12, Ex. 17; 466:10-466:25, Ex. 18.  Shumaker received notice that she would be "administratively transferred" on January 28, 2011, but did not file EEOC and DFEH complaints until October 17, 2011.  Shumaker Decl. ¶ 7, Exs. L, M; Sandoval Decl. at Ex. B, 141:15-142:3, Ex. 5.

22

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

allege they engaged in.  See id.  The court disagrees with Defendants' characterization of

Plaintiffs' claims.  Drawing all reasonable inferences in their favor, the court understands

Shumaker and Chambers' claims as alleging retaliation based on the activities from which their

respective complaints arose, not simply the act filing of the complaint itself.

 With this in mind, Plaintiffs contend they suffered retaliation from Defendants in violation

of FEHA for raising concerns regarding the hiring male nurses.  See Opp. at 10-11.   Individually,

Chambers also alleges that Defendants retaliated against her for exposing what she perceived to be

corruption, misuse of public funds, and unethical hiring practices.  Opp. at 11; see also Chambers

Decl. ¶ 3; Sandoval Decl. at Ex. H, 307:2-308:10  4, Ex. 11.  And Shumaker asserts that

Defendants retaliated against her for her union activity opposing employee layoffs.  See Opp. at

10-11.  The court addresses these instances below.

### 1.   Opposition to Hiring Male Nurses and Advocacy on Behalf of Patients

 Both Shumaker and Chambers identify their opposition to the hiring of male nurses in the

MICC and their "advocacy" on behalf of their patients' preferences for female nurses as the

protected activity for which they contend Defendants retaliated against them.  See Opp. at 10-11.

However, for the purposes of a FEHA retaliation claim, opposition to a particular policy or

practice is generally not considered protected activity unless the opposed policy or practice was

proscribed under FEHA.  See Cal. Gov't Code § 12940(h) (prohibiting retaliation based on an

employee's opposition to "any practices forbidden under this part …").   Plaintiffs make only

conclusory allegations that their "zealous" advocacy on behalf of their patients constitutes

protected activity and fail to present any argument or evidence as to why the hiring of male nurses

in the MICC constitutes a "forbidden" practice under FEHA.  See Opp. at 10-11.

Nevertheless, a retaliation claim can still survive summary judgment when an employee complains

of or opposes a practice that the she reasonably believes is unlawful, even if a court later

determines the conduct was not actually prohibited.  See, e.g., Moyo v. Gomez, 40 F.3d 982, 984

(9th Cir. 1994) ("It is not necessary...that the employment practice actually be unlawful;

United States District Court
Northern District of California

1    opposition clause protection will be accorded whenever the opposition is based on a '*reasonable*

2    *belief*' that the employer has engaged in an unlawful employment practice.") (quoting <u>EEOC v.</u>

3    <u>Crown Zellerbach Corp.</u>, 720 F.2d 1008, 1013 (9th Cir.1983)) (emphasis in original); <u>Miller v.</u>

4    <u>Dep't of Corr.</u>, 36 Cal. 4th 446, 474 (2005) (An employee is protected against retaliation if the

5    employee reasonably and in good faith believed that what he or she was opposing constituted

6    unlawful employer conduct…").  However, Plaintiffs offer nothing to suggest that they reasonably

7    believed the practice of hiring both female and male nurses in the MICC was unlawful, and the

8    court finds no basis to support such a theory here.

9         Plaintiffs' reliance on <u>Misericordia Hospital Medical Center v. N.L.R.B.</u>, 623 F.2d 808 (2d

10   Cir. 1980), for the proposition that healthcare workers' complaints regarding patient welfare

11   constitute protected activity is also unavailing.  In <u>Misericordia</u>, the Second Circuit held that

12   hospital employees' involvement in preparing a report that raised issues regarding patient welfare

13   and employee working conditions was "protected activity" for the purposes of their retaliation

14   claims against the hospital.  623 F.2d at 813.  Importantly, however, the plaintiffs in <u>Misericordia</u>

15   filed suit under the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-169, which

16   includes specific protections for the rights of employees to engage in "activities for the purpose of

17   collective bargaining or other mutual aid or protection." <u>Id.</u> at 813 (citing 29 U.S.C. § 157).

18   Therefore, it was not simply the action of reporting concerns about patient welfare that was

19   determinative, but rather the court's interpretation that the action of doing so collectively was

20   within the protections contemplated by the NLRA's provisions.  Here, in contrast, Plaintiffs bring

21   their retaliation claims under FEHA and fail to explain how the hiring of male nurses is forbidden

22   thereunder, such that their opposition to this practice would constitute protected activity.

23   Summary judgment is therefore GRANTED to the extent that Plaintiffs' claims are based on

24   Shumaker and Chambers' opposition to the hiring of male nurses.

25                        2.  <u>Chambers' "Whistleblower" Activity</u>

26        Individually, Chambers argues that her actions in bringing to light what she viewed as

27

28
Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

United States District Court
Northern District of California

1    corruption, a misuse of public funds, and improper or unethical hiring practices in the MICC was

2    also protected activity under FEHA.  Opp. at 11.  Although Plaintiffs again do not specify in what

3    way this practice is "forbidden" under FEHA, here Chambers presents sufficient evidence to

4    establish that she reasonably believed Defendants were engaging in unlawful conduct.  See

5    Moyo, 40 F.3d at 984; Miller, 36 Cal. 4th at 473.  The record indicates that on or about February

6    11, 2011, Chambers contacted Johnson and informed her of what she considered to be corruption

7    and unlawful hiring practices occurring in the MICC.  Chambers Decl. ¶ 3, Ex. 1; Sandoval Decl.

8    at Ex. H, 307:2-4, Ex. 11.  In her email, Chambers made reference to specific practices that she

9    perceived as improper, including that Traw hired Mikami without publicly posting the position

10   and sent him to a paid breastfeeding class with public grant funding.  Sandoval Decl. at Ex. H,

11   307:5-308:10, Ex. 11.

12           Viewing the evidence in the light most favorable to Plaintiffs, Chambers demonstrated that

13   she had a reasonable belief Defendants' were engaging in unlawful and unethical practices.  Even

14   if Chambers' belief was later determined to be incorrect, her retaliation claim is actionable so long

15   as her mistaken belief was made in good faith.  Moyo, 40 F.3d at 984.  Finding no proof of bad

16   faith in the record, the court concludes that Chambers so-called "whistleblower activity" is

17   protected under FEHA.  Accordingly, Chambers has sufficiently established a prima facie case of

18   retaliation, and the burden now shifts to Defendants to articulate legitimate, nondiscriminatory

19   reasons for taking any adverse employment action against her.

20                           3.  Shumaker's Union Activities

21           Shumaker also alleges retaliation based on, or in relation to, her union activities – namely,

22   her "opposition to Defendants and the Board of Supervisor's reduction in Registered Nursing

23   staff."  Opp. at 10; FAC ¶¶ 58-59.  Defendants argue that Shumaker's union activities are not a

24   protected activity under FEHA and are preempted by the NLRA.  Mot. at 14.

25           Section 7 of the NLRA protects employees' rights to self-organize, to join, form, or assist

26   labor unions, and to "engage in other concerted activities for the purpose of collective bargaining

27

28
     Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

1    or other mutual aid or protection ...." 29 U.S.C. § 157.  Section 8 prohibits employers from

2    restraining or otherwise interfering with an employee's exercise of those rights.  29 U.S.C. § 158.

3    While the NLRA contains no express preemption provision, the Supreme Court mandates that

4    both state and federal courts "must defer to the exclusive competence of the National Labor

5    Relations Board in cases in which the activity that is the subject matter of the litigation is arguably

6    subject to the protections of [section] 7 or the prohibitions of [section] 8 of the [NLRA]."  Linn v.

7    Plant Guard Workers, 383 U.S. 53, 60 (1966); San Diego Bldg. Trades Council, Millmen's Union,

8    Local 2020 v. Garmon, 359 U.S. 236, 244-45 (1959).  For an action to be considered "within the

9    ambit of the NLRA, the action must be 'concerted,' that is, it must be taken with or on behalf of

10   other employees, and not solely by and on behalf of the . . . employee [herself]. "  Mayes v. Kaiser

11   Found. Hosps., 917 F. Supp. 2d 1074, 1082 (E.D. Cal. 2013) (quoting Natl. Labor Relations Bd. v.

12   Yurosek, 53 F.3d 261, 264 (9th Cir. 1995)).

13          Here, although Shumaker argues that she was acting as a "private citizen," her actions

14   reflect a concerted effort on behalf of the union to protect her and her fellow nurses from

15   impending layoffs.  See Yurosek, 53 F.3d at 261, 266 ("concerted employee activities are

16   protected when the activities can reasonably be seen as affecting the terms or conditions of

17   employment").  Indeed, Plaintiffs' expressly state that as part of Shumaker's continuing work as

18   the RNPA union representative, she "was vocal in support of saving jobs for her fellow nurses,"

19   and "*[a]s a union leader*," she participated in discussions with other employees about patients'

20   preference for female nurses and conveyed their concerns to management.  FAC ¶¶ 57-59

21   (emphasis added).  Furthermore, Plaintiffs' assert that these actions were, in part, the reason

22   Defendants took retaliatory action against her, and thus the basis of her FEHA retaliation claim.

23   See, e.g., Opp. at 10 (arguing that Defendants "retaliat[ed] against Shumaker for *her union*

24   *activities*") (emphasis added); FAC ¶ 59 (alleging that "[t]he county and Defendant Barbara Traw

25   took adverse action against Ms. Shumaker because she spoke out for patients' care and *for [her]*

26   *union activities*") (emphasis added); see also Sandoval Decl. at Ex. B, 124:2-125:20.

27

28

It is apparent from the record that much of Shumaker's union-related activity was undertaken to help the organization and to protect the jobs of union nurses.  Shumaker Decl. ¶¶ 4-6; Sandoval Decl. at Ex. B, 123:5-124:14; 127:16-128:18.  These efforts are fairly characterized falling within the purview of Section 7, which protects an employee's right to "assist labor organizations" and to "engage in other concerted activities for the purpose of …mutual aid or protection."  29 U.S.C. § 157; Garmon, 359 U.S. at 244-45.  And because Shumaker's subsequent transfer to the night shift could be considered an adverse employment "subject to the prohibitions of Section 8," this dispute is properly governed by the NLRA.  Linn, 383 U.S. at 60; see California Acrylic Indus., Inc. v. N.L.R.B, 150 F.3d 1095, 1099 (9th Cir. 1998) (stating that employer violates § 8(a)(1) by "engaging in activity that tends to chill an employee's freedom to exercise [her] section 7 rights").  Shumaker's retaliation claim under FEHA is therefore preempted by the NLRA to the extent that it is based on her union activities.  Garmon, 359 U.S. 236, 244-45 (1959) (holding that the NLRA preempts state law "[w]hen it is clear or may be fairly assumed that the activities that a State purports to regulate are protected by [section] 7 ... or constitute an unfair labor practice under [section] 8.").

### ii.    Legitimate, Non-Discriminatory Reasons for Adverse Action and Pretext

Turning to Plaintiffs' remaining allegations, Defendants do not challenge Plaintiffs' prima facie case, but instead assert that there were legitimate, non-discriminatory reasons for the adverse employment actions identified by Plaintiffs.  See Mot. at 17-20; Avila, 165 Cal. App. 4th at 1247-48.  Legitimate reasons are reasons that are facially unrelated to prohibited bias, which, if true, preclude a finding of discrimination.  Guz, 24 Cal. 4th at 358; see, e.g., McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992) (explaining that the ultimate issue was whether the employer "honestly believed in the reasons it offer[ed].").  In order for Defendants to meet their burden, they must "clearly set forth, through the introduction of admissible evidence,' reasons for [their] actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action."  St.

27

1    Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993) (quoting Burdine, 450 U.S. at 254-55)

2    (emphasis in original); see also Guz, 24 Cal. 4th at 355-56.

3         If Defendants satisfy this requirement, the burden shifts back to Plaintiffs to show that

4    Defendants' proffered non-discriminatory reasons are actually pretext for discrimination.  "A

5    plaintiff can show pretext directly, by showing that discrimination more likely motivated the

6    employer, or indirectly, by showing that the employer's explanation is unworthy of credence."

7    Vasquez v. Cty. of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003), as amended (Jan. 2, 2004).

8    When only circumstantial evidence of pretext is available, such evidence must be "specific" and

9    "substantial."  Wallis v. J.R. Simplot Co., 26 F.3d 885, 890 (9th Cir. 1994); see also Godwin v.

10   Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998) (holding that a plaintiff "must produce

11   evidence in addition to that which was sufficient for her prima facie case in order to rebut the

12   defendant's showing" of non-discriminatory purpose).  A showing that Defendants treated other

13   similarly-situated employees outside of Plaintiffs' class more favorably "would be probative of

14   pretext."  Vasquez, 349 F.3d at 641.

15        While it is not entirely clear which actions Plaintiffs specifically contend form the basis of

16   their respective discrimination and retaliation claims, by way of summary Plaintiffs' allege that

17   they suffered adverse employment actions in the form of (1) discriminatory patient assignments;

18   (2) the publication of nurses' schedules showing that Smith and Chambers were attending a sexual

19   harassment class; (3) "sham" HIPAA investigations into Smith and Chambers,  (4) Shumaker's

20   administrative transfer to the night shift (5) the denial of Chambers' request to change her

21   scheduled day off; and (6) various write-ups, including "Unfavorable Reports," "Written

22   Counselings," and negative performance evaluations.  Opp. at 4-6, 16, 18-20.  Because the facts

23   and circumstances surrounding these actions vary, each will be addressed in turn.

24                    *a.  Smith and Chambers' Patient Assignments*

25        Smith and Chambers contend that Ablan created patient assignments that favored Filipino-

26   American nurses, thereby discriminating against them.  FAC ¶¶ 36, 69.  Defendants do not

27                                              28

28   Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

1   challenge Plaintiffs' prima facie case, but rather assert that there were legitimate, non-

2   discriminatory reasons that Smith and Chambers might have received difficult patient

3   assignments.  Defendants submit Smith's undisputed testimony admitting that patient assignments

4   can be complex, and describing how assignments may be based on a variety of factors, including

5   the number of patients in the MICC, the acuity level of the patients, and/or how many nurses were

6   available at a given time.  Sandoval Decl. at Ex. F, 33:22-34:25; 37:5-21.  Based on this evidence,

7   Defendants sufficiently establish that distinct, non-discriminatory reasons for the particular patient

8   assignments.

9        As a result, the burden now shifts to Plaintiffs to offer "specific" and "substantial"

10  evidence that Defendants' stated nondiscriminatory reasons are untrue or pretextual.  See Hersant

11  v. Dep't of Soc. Servs., 57 Cal. App. 4th 997, 1004-1005 (1997).  Although Plaintiffs claim to

12  "have overwhelming evidence that the patient assignments by Ablan favor Filipino-American

13  Nurses," the only evidence they offer that directly supports this accusation is the declaration

14  testimony of two hospital employees - Norma Cedillo and Kathy Motiei - who state that they

15  observed Ablan give unfair assignments to non-Filipino nurses.  See Declaration of Norma Cedillo

16  ("Cedillo Decl.") ¶¶ 4, 5, 9, Dkt. No. 59-1; Declaration of Kathy Motiei ("Motiei Decl.") ¶ 13,

17  Dkt. No. 59-4.  However, the only specific example offered by Cedillo is that on one occasion, she

18  witnessed Ablan give Smith a "high acuity" patient, while "another Filipino nurse had a very low

19  acuity assignment."  Cedillo Decl. ¶ 4.  The remainder of Cedillo's declaration provides only

20  general or conclusory allegations, such as "[f]avoritism and preferential treatment are common

21  practices in the MICC unit, especially practiced by ANM Anabelle Ablan."  Id. ¶ 5.  Similarly,

22  Motiei's declaration states that when she and another nurse both returned from being sick, Ablan

23  gave the "more favorable assignments to the Filipina-American nurse."  Motiei Decl. ¶ 13.  Motiei

24  says that she observed Ablan "consistently giving more difficult assignments with higher acuity

25  patients to other non-Filipina nurses, including Dagmar Chambers and Gina Smith," but provides

26  no other specific examples of such behavior.  Id.

27

28

United States District Court
Northern District of California

Plaintiffs' evidence establishes at least two specific occasions in which a non-Filipino-American nurse received a more difficult patient assignment than a Filipino-American nurse. However, given that the difficulty of patient assignments varies regularly based on the circumstances, it is to be expected that, on any given day, someone will end up with a "more difficult" assignment that someone else.  The fact that on these two instances it happened to be a non-Filipino-America nurse is insufficient, without more, to show pretext.  Plaintiffs offer neither specific nor substantial evidence that Defendants' proffered reasons for the patient assignments were pretext for racial discrimination.  See Wallis, 26 F.3d at 890; Godwin, 150 F.3d at 1220. Therefore, to the extent that Smith and Chambers' discrimination claims are based on allegedly discriminatory patient assignments, Defendants' motion for summary judgment is GRANTED.

**b. *Publication of Schedules Showing Smith and Chambers' Attendance in Sexual Harassment Training***

Smith and Chambers also allege that Traw discriminated and retaliated against them by posting the nurses' schedules, which included information showing that they were required to attend mandatory sexual harassment trainings.  Defendants do not contest Smith or Chambers' prima facie case of discrimination, or Smith's prima facie case of retaliation.  Additionally, the court found that Chambers' established a prima facie case of retaliation to the extent that the claim was based on her attempt to expose corruption and unlawful hiring practices.  Moving to the burden shifting analysis, Defendants offer admissible evidence that Traw routinely posted the schedules in this manner, including which trainings nurses were attending, to help remind the nurses about the dates and times of the training they were attending.  Sandoval Decl. at Ex. A, 172:23-173:9.  Accordingly, Defendants met their burden to show a legitimate, non-discriminatory reason for including Smith and Chambers' sexual harassment training on the nurses' posted schedule and the burden shifts to Plaintiffs to show pretext.

In response, Plaintiffs assert that Smith and Chambers' attendance in the sexual harassment training was "part of their discipline," and contend there was "no legitimate reason for publishing

30

confidential personnel matters to those who do not need to know." Opp. at 18. However, Plaintiffs fail to provide any evidence showing what "confidential personnel matters" were actually disclosed. See id. The only evidence Plaintiffs offer is Traw's testimony that Smith and Chambers' attendance in the class itself was part of their discipline. Bonner Decl. at Ex. 1, 168:19-169:12. Whether Traw had a legitimate basis for disciplining Smith and Chambers is a separate issue. But as to the publication of their attendance in training course, Smith herself testified that the nurses' schedules routinely included the name of the training and the name of any nurses who were attending. Sandoval Decl. at Ex. F, 243:13-23. There is no evidence that Smith and Chambers' attendance was singled out or identified as part of a disciplinary process. Rather, the undisputed testimony in the record indicates that posting this information was consistent with the normal, routine practice in the MICC. See id.; Bonner Decl. at Ex. 1, 168:19-169:12; Sandoval Decl. at Ex. A, 172:23-173:9. Plaintiffs therefore failed to show that Defendants' stated reasons for Traw's actions were pretextual. Accordingly, to the extent that Smith and Chambers' discrimination and retaliation claims rely on the publication of the training schedules, Defendants' motion for summary judgment is GRANTED.

### c. HIPAA Investigations

Plaintiffs further allege that the HIPAA investigations of Smith and Chambers were "shams" constituting adverse employment actions. See FAC ¶¶ 23, 24, 41, 72-77. Defendants assert that in both cases, Traw and Hughes had legitimate, non-discriminatory reasons for their actions. Mot. at 19. With respect to Smith, Hughes testified that the investigation was in response to allegations that Smith brought copies of her work assignments containing private patient information to her meeting with the EOD. Sandoval Decl. at Ex. D, 201:4-202:8; 208:12-19; 209:20-210:19; see also Ex. A, 429:1-430:20. With respect to Chambers, Traw testified that another employee identified Chambers as the source of a "tip" to a *San Jose Mercury News* reporter, disclosing confidential patient information regarding the adoption of a baby in the MICC. Id. at Ex. A, 192:4-15; 201:16-204:17; see also Ex. D, 304:20-306:16. Based on this evidence,

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    Defendants have sufficiently set forth legitimate, non-discriminatory reasons for initiating HIPAA

2    investigations with respect to both Smith and Chambers.

3         Plaintiffs make no argument of any kind with respect to Smith and instead focus the

4    entirety of their HIPAA discussion on Chambers.  See Opp. at 19-22.  Consequently, the court

5    finds that summary judgment is appropriate on this issue as to Smith.

6         In contrast, Plaintiffs provide ample evidence undermining the legitimacy of Defendants'

7    proffered basis for the HIPAA investigation of Chambers.  See id.  In her deposition, Hughes

8    admits that (1) Chambers never took care of the baby being adopted; (2) Chambers never met the

9    adoptive mother; (3) Chambers was not working the weekend the mother and baby were at the

10   hospital; and (4) Chambers did not know the reporter, Steve Herhold.  Bonner Decl. at Ex. 7,[8]

11   151:9-25; 152:1-6.  Plaintiffs also cite Hughes' testimony that the employee who identified

12   Chambers as the source of the disclosure, Debbie Williams, made confusing and inconsistent

13   statements regarding whether Chambers actually admitted to contacting Mr. Herhold.  Id. at Ex. 7,

14   145:11-146:22.  Finally, Plaintiffs offer evidence that Traw admitted to threatening Williams that

15   she could be accused of being source of the disclosure herself if she did not sign a written

16   "attestation" stating that it was Chambers who contacted the reporter.  Id. at Ex. 1, 205:12-206:19.

17        Chambers has offered admissible evidence that calls into question the trustworthiness of

18   Defendants' explanation for the HIPAA investigation.  Accordingly, the court finds that Chambers

19   met her burden to show pretext.  See Chuang v. Univ. of Cal. Davis, Bd. of Trustees, 225 F.3d

20   1115, 1127 (9th Cir. 2000) (holding that a plaintiff can prove pretext indirectly by showing that

21   the employer's proffered explanation is "unworthy of credence" because it is internally

22   inconsistent or otherwise not believable); Vasquez, 349 F.3d at 641 (same).  The court disagrees

23   with Defendants that Plaintiffs failed to sufficiently refute Hughes' "honest belief" that Chambers

24   provided the reporter with confidential information.  Reply at 11.  Plaintiffs identify specific

25   _____

26   [8] Plaintiffs' cite Hughes' deposition testimony as Exhibit 8, which is incorrect.  Hughes'
     deposition testimony is actually Exhibit 7 to the C. Bonner Declaration, filed under seal (Dkt. No.
27   73).

28   Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

factual discrepancies in Defendants' evidence, as well as admissions by Hughes and Traw suggesting the HIPAA investigation was suspect and the justifications offered for it unreliable.  At a minimum, the court finds there is a triable issue of fact as to whether the HIPAA investigation into Chambers was for a legitimate reason.

Based on the foregoing, to the extent that the underlying discrimination and retaliation claims arise from the HIPAA investigations, Defendants' motion for summary judgment is GANTED as to Smith and DENIED as to Chambers.

### d.  Denial of Chambers' Schedule Change Request

Individually, Chambers further asserts that on November 11, 2011, Traw denied - or revoked - her previously approved request to modify her work schedule to take an extra day of vacation for Thanksgiving.  FAC ¶ 77.  Plaintiffs contend that this "was a deliberate act of retaliation, designed to interfere with Mrs. Chambers' planned vacation schedule, and was designed in retaliation for the fake HIPAA investigation."  FAC ¶ 77.  Defendants counter that Traw denied the request because she "believed it to be unsafe for nurses to work more than eight days in a row."  Traw Decl. ¶ 6.

Having provided a legitimate, non-discriminatory reason for the denial, the burden now shifts to Plaintiffs to show evidence of pretext.  The record contains admissible evidence that, prior to November 2011, Chambers frequently worked more than eight days in a row.  Chambers Decl. ¶ 49.  Specifically, Chambers proffers that in the month prior to the denial, she had worked ten days in a row between August 30, 2011 and September 8, 2011, and subsequently has continued to work for as many as ten days in a row.  Id.  Additionally, there is no evidence of an official policy change in the record that would otherwise explain these differences in scheduling.  Plaintiffs' evidence casts doubt on the viability and trustworthiness of Defendants' stated reasons for the denial or revocation of Chambers' approved modification to her work schedule.  See Chuang, 225 F.3d at 1127; Vasquez, 349 F.3d at 641.

Based on the foregoing, the court finds that there is a triable issue of fact as to whether

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

1    Defendants' denial of Chambers requested days off was for a legitimate, non-discriminatory

2    reason.  Accordingly, to the extent that Shumaker's claim of retaliation is based on Defendants'

3    denial of requested schedule change, Defendants' motion for summary judgment is DENIED.

### e. Shumaker's Administrative Transfer to the Night Shift

5        Shumaker's remaining Title VII and FEHA claims allege that she suffered disparate

6    treatment on account of her age, race, and gender when she was administratively transferred to the

7    night shift.[9]  Here, Defendants set forth admissible evidence that Shumaker's transfer was

8    necessary in order to prevent the MICC from becoming understaffed following the February 2011

9    layoffs.  Sandoval Decl. at Ex. B, 534:20-537:11, Ex. 67; 538:2-539:7, Ex. 68; 540:12-18, Ex. 69.

10   Defendants explain that the two nurses laid off during the process were both on the night shift.  As

11   a result, and pursuant to the RNPA Agreement's layoff process, the least senior 0.5 coded

12   position(s) were to be transferred to night shift in order to provide sufficient nursing coverage in

13   the unit.[10]  Id.  Because Shumaker occupied the lowest code 0.5 and had the least seniority on the

14   evening shift, she was transferred to the night shift.  Sandoval Decl. at Ex. B, 534:20-537:11, Ex.

15   67; 538:2-539:7, Ex. 68; 540:12-18, Ex. 69.

16       Although Shumaker contends that the County could have accommodated her by giving her

17   one of the positions occupied by the younger and less senior male nurses, Defendants explain that

18   these assignments were "extra help" positions, and that the MICC did not have any vacant 0.5

19   coded positions available.[11]  Id. at Ex. A, 536:17-537:11.  Defendants further state that the County

20   could not just create a "temporary fix" position for Shumaker in order to accommodate her until a

---

[9] The court previously granted summary judgment as to Shumaker's claims for (1) discrimination based on medical condition; (2) retaliation based on her opposition to hiring male nurses; and (3) retaliation based on her union activity.

[10] Sections 5.4-5.5 of the RNPA Agreement govern the process through which the hospital may undertake necessary layoffs, specifying that the "order of layoff shall be based on seniority as applied to each classification."  Cox Decl. ¶ 7, Ex. A, § 5.4 at 8.

[11] Traw testified that Shumaker could not replace "extra help" or "as needed" nurses because her 0.5 coded position required her to work five days a week in a two-week period, while the "extra help" nurses had no such requirement.  Id. at Ex. A, 536:17-537:11.

34

1   coded position became available.  C. Bonner Decl. at Ex. 9, 84:3-86:6, Dkt. No. 63-9.  Defendants

2   also provided evidence that after Shumaker went out on medical leave and requested to be

3   transferred to either a day or evening shift, Mark Cursi, the Coordinator of Programs for the

4   Disabled for the EOD, requested that the Nurse Recruiter for the County search for any open 0.5

5   coded nurse positions anywhere in the hospital.  Id. at Ex. 9, 58:2-60:9.  However, Cursi testified

6   that there were no open positions and Shumaker's request could not be accommodated at that time.

7   Id. at Ex. 9, 58:2-60:9; 87:21-88:11.  Defendants' proffered evidence sets forth legitimate, non-

8   discriminatory bases for Shumaker's alleged adverse employment actions that are, on their face,

9   unrelated to her race, gender, or age.   Accordingly, the burden now shifts to Shumaker to show

10  evidence of pretext.

11       Shumaker alleges that Defendants' stated reasons for the administrative transfer are pretext

12  for discrimination based on the following assertions: (1) Traw hired three new extra help nurses in

13  February 2011 and all were men, including Mikami; (2) the positions were not publicly posted; (3)

14  Mikami was not the most qualified person for the job; (4) there were "more than enough shifts to

15  give Shumaker a temporary position," such as an "extra help" nurse; and (5) Defendants gave

16  Traw a temporary position accommodation when her code was eliminated.  See Opp. at 23.

17       However, as discussed above, the evidence presented by Defendants highlights the

18  distinction between Shumaker's coded position and the "extra help" positions for which the male

19  nurses were hired.  Sandoval Decl. at Ex. A, 82:2-83:24; Cox Decl. ¶ 6.  The record reflects that

20  Shumaker was not similarly situated to either the male "extra help" hires or the other, more senior

21  0.5 coded nurse who did not get transferred.  See id.; see also Vasquez, 349 F.3d at 641.  And

22  although Shumaker seems to suggest that she should have been given one of the "extra help"

23  positions filled by a male nurse as an accommodation, she testified that Mark Cursi had discussed

24  this option with her and she stated that she "did not think it was fair," expressing an interest in

25  maintaining her coded position.  Reply Declaration of Beth Arnese ("Arnese Decl."), at Ex. E,

26  240:18-241:2.

27

28
    Case No.: 5:11-cv-05643-EJD
    ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT

United States District Court
Northern District of California

1      Additionally, while it is true that the County created an interim assignment for Traw after

2   her position had been removed in 2007, Traw is also not similarly situated to Shumaker.  See C.

3   Bonner Decl. at Ex. 1, 36:9-38:18; see also Vasquez, 349 F.3d at 641.  The fact that the County

4   was able to create or place Traw in a temporary position as a Nurse Manager "for a couple

5   months" is distinct from their ability to do so for a 0.5 coded nurse like Shumaker.  This is

6   insufficient to show pretext.  Moreover, Shumaker makes no reference to age or race in her

7   argument, and cites no evidence to support a claim of discrimination based on these traits.

8      Shumaker's assertions provide neither "specific" nor "substantial" evidence that

9   Defendants' stated reasons for her administrative transfer are actually pretext for discrimination.

10  See Wallis, 26 F.3d at 890; Godwin, 150 F.3d at 1220-21.  Conversely, Defendants offer evidence

11  of the specific and formalized process by which Shumaker was selected for transfer and explain

12  why the County could not accommodate Shumaker with a different shift until a 0.5 code became

13  available.  Accordingly, the court hereby GRANTS summary judgment in favor of Defendants as

14  to Shumaker's discrimination claims based on age, gender and race.

15          *f.   Unfavorable Reports and Written Counseling*

16     Smith and Chambers claim retaliation based on the Employee Unfavorable Reports and

17  written counseling issued to them by Traw on various dates.  Defendants argue there existed

18  legitimate, non-retaliatory reasons for the Unfavorable Reports.

19     Here, the evidence shows that Traw issued the Unfavorable Reports to Smith and

20  Chambers based on perceived violations of the anti-discrimination policy.  Indeed, as noted, the

21  report issued to Smith states that her comments to Dr. Byrne were "a violation of the County of

22  Santa Clara's Policy Against Discrimination, Harassment, and Retaliation."  Smith Decl., Ex. 2.

23  In addition, Traw testified the report was issued to Smith based on the conclusion reached by the

24  "Equal Opportunity Division" and "Labor Relations" that Smith's comment about male nurses

25  violated the County's anti-discrimination policy.  Sandoval Decl. at Ex A, 378:35-379:11.

26  Similarly, Traw testified she issued an Employee Unfavorable Report to Chambers based on a

27

28  Case No.: 5:11-cv-05643-EJD
    ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT

36

United States District Court
Northern District of California

1   decision from the "upper administrative level" and "Labor Relations" that a statement Chambers

2   made about not helping male nurses "violates the County policy." Id. at Ex. A, 112:7-11; 127:18-

3   128:3.

4          The evidence also shows that Traw issued the written counseling to Smith on June 8, 2011,

5   based on information she received that on May 17, 2011, Smith interrupted the charge nurse three

6   times, and that Smith had contributed to an "unharmonious work environment" by comparing her

7   work assignments to other nurses, acting unprofessionally, refusing to take breaks, and raising her

8   voice to colleagues.  Traw Decl. ¶ 4; Ex. B.

9          In addition, the record contains evidence showing that Traw gave Chambers the written

10  counseling in September, 2012, based on information that Chambers mishandled the care of a

11  patient.  The written counseling itself states that Chambers "left the floor" while a patient was

12  hemorrhaging and mislabeled a blood draw.  Traw Decl., at Ex. D.  Chambers also admitted that

13  she mislabeled the blood draw.  Sandoval Decl. at Ex H, 348:1-349:1.[12]

14         On this record, Defendants have successfully rebutted any inference of discrimination or

15  retaliation with legitimate reasons for the adverse employment actions.  Thus, the court finds they

16  have satisfied their burden on this level of the analysis.

17         The burden now shifts back to Plaintiffs to demonstrate a genuine issue of material fact as

18  to whether the reasons advanced by Defendants are pretext for retaliation.  Brooks, 229 F.3d 917,

19  928 (9th Cir. 2000).  Plaintiffs have not produced evidence on which a reasonable jury could find

20

21  [12] In their briefing, the parties also address Chambers' 2011 performance review in which she was
    given a "standard" rating.  Plaintiffs, however, failed to include an allegation concerning the 2011
22  review in the Complaint and, while they respond to Defendants' argument, Plaintiffs did not
    discuss it in their Opposition in connection with any of Chambers' causes of action for
23  discrimination or retaliation.  Furthermore, Plaintiffs failed to cite evidence pertaining to the 2011
    review anywhere in the opposition.  Accordingly, the court concludes that Plaintiffs failed to meet
24  their burden to properly raise the 2011 review as a basis for any cause of action.  See Matsushita
    Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1985) (holding that in response to a
25  motion for summary judgment, the nonmoving party "must come forward with 'specific facts
    showing that there is a genuine issue for trial'"); Carmen v. San Francuisco Unified Sch. Dist.,
26  237 F.3d 1026, 1030 (9th Cir. 2001) ("[T]he district court may limit its review to the documents
    submitted for the purposes of summary judgment and those parts of the record specifically
27  referenced therein.").

28  Case No.: 5:11-cv-05643-EJD
    ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT

United States District Court
Northern District of California

that Defendants' proffered reasons are pretext.  In summary, Plaintiffs argue that Traw's decisions to issue the Employee Unfavorable Reports and written counseling were based on false information or on statements that Smith and Chambers deny making.  But this argument aside, they offer no evidence outside of their own speculation that Traw did not honestly believe that the conduct for which Smith and Chambers were disciplined constituted violations of County policy, in light of what Traw was told by other nurses, the "Equal Opportunity Division," "Labor Relations," and "upper administrative level."  Sandoval Decl. at Ex. A, 112:7-11; 127:18-128:3; see Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th Cir. 2002) (holding that pretext is not shown if "'an employer honestly believed its reason for its actions, even if its reason is 'foolish or trivial or even baseless'").  And although they take issue with Traw's investigations, whether or not they were sufficient or flawed is irrelevant in the absence of any evidence showing Traw doubted the information contained in the reports and counseling.  See id.; see also Vallimont v. Chevron Energy Tech. Co., 434 Fed. Appx. 597, 599 (9th Cir. 2011) ("[E]ven if Gallacher's investigation were flawed, the record is void of any indication that Hedges lacked a sincere belief in her findings."); Smith v. Gardiner, 362 Fed. Appx. 822, 823 (9th Cir. 2010) ("It is irrelevant that Smith . . . states the person who reported that story to Goulet was lying, or that Goulet did not conduct an investigation before firing Smith.  The inquiry is whether there was evidence from which a fact-finder could infer that Goulet and Par did not truly believe the proffered reason for the termination.").

In the absence of sufficient evidence to establish pretext, Defendants' motion for summary judgment is GRANTED as to the retaliation claims of Smith and Chambers to the extent they are based on the Unfavorable Reports and written counseling.

### D.  Disparate Impact

In the fifth, seventh and eighth causes of action, Plaintiffs allege the County's employment practices had an adverse impact in violation of Title VII and FEHA.  In response, Defendants argue that Plaintiffs cannot support these claims with admissible evidence.

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Disparate impact claims challenge "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003). Because such claims are subject to the same burden-shifting framework as other discrimination claims, a plaintiff must first make out a prima facie case by showing proof of (1) the occurrence of certain outwardly neutral employment practices, and (2) a significantly adverse or disproportionate impact on persons of a particular group produced by the employer's facially neutral acts or practices. Pottenger v. Potlatch Corp., 329 F.3d 740, 749 (9th Cir. 2003); The Comm. Concerning Cmty. Improvement v. City of Modesto, 583 F.3d 690, 711 (9th Cir. 2009). "A plaintiff establishes a prima facie case of disparate impact by showing a significant disparate impact on a protected class caused by a specific, identified, employment practice or selection criterion." Stout v. Potter, 276 F.3d 1118, 1121 (9th Cir. 2002).

Plaintiffs have not satisfied their initial burden to show a prima facie case of disparate impact. Though they claim to have "overwhelming evidence that the patient assignments . . . favor Filipino-American nurses" and that Traw and Alban "do not treat nurses in the MICC, including Chambers, Smith and Shumaker and several others fairly," the declarations they cite in support of that argument do not identify a specific, facially neutral employment practice. See Opp. at 25. Instead, all that is described by the declarations is the manner by which one employee, Alban, is perceived to have treated nurses assigned to the MICC. See id.

Nor have Plaintiffs provided any evidence sufficient to show a causal relationship between a qualifying employment practice and some adverse impact on a protected class. "[T]he focus in a disparate impact case is 'on statistical disparities, rather than specific incidents, and on competing explanations for those disparities.'" Rose v. Wells Fargo & Co., 902 F.2d 1417, 1424 (9th Cir. 1990) (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986 (1988)). Again, the evidence provided by Plaintiffs is limited solely to the alleged mistreatment of certain nurses rather than on an overall disproportionate impact on a particular protected class. As such, even if

Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

1    Plaintiffs had successfully identified a specific policy, their showing is nonetheless more akin to a

2    description of "specific incidents" than a demonstration of disproportionate impact on a protected

3    group.

4         Since Plaintiffs have failed to establish a prima facie case for their disparate impact causes

5    of action, Defendants' motion for summary judgment is GRANTED as to the fifth, seventh and

6    eighth causes of action.

7         **E.    Negligent Hiring, Training and Supervision**

8         Plaintiffs' Tenth Cause of Action alleges negligent hiring, training, supervision, and

9    retention against all Defendants pursuant to 42 U.S.C. § 1983.  FAC ¶¶ 126-131.  State entities

10   may not be held liable under § 1983, "unless a policy, practice, or custom of the entity can be

11   shown to be a moving force behind a violation of constitutional rights."  Dougherty v. City of

12   Covina, 654 F.3d 892, 900 (9th Cir. 2011).  A "failure to train" or "failure to supervise" theory

13   may serve as the basis for liability under § 1983 only where the failure amounts to a policy of

14   "deliberate indifference" as to the rights of the persons with whom municipal actors come into

15   contact.  City of Canton, Ohio v. Harris, 489 U.S. 378, 387-88 (1989).  A practice constitutes a

16   policy of deliberate indifference when, "in light of the duties assigned to specific officers or

17   employees[,] the need for more or different training is so obvious, and the inadequacy so likely to

18   result in the violation of constitutional rights, that the policymakers of the city can reasonably be

19   said to have been deliberately indifferent to the need."  Id. at 390.

20        This means that to prevail on a failure to train claim against a municipality, a plaintiff must

21   "demonstrate a "conscious" or "deliberate" choice on the part of a municipality."  Price v. Sery,

22   513 F.3d 962, 973 (9th Cir. 2008).  The same standard applies with respect to claims made against

23   municipal officers or supervisors in their individual capacity.  Flores v. Cty. of Los Angeles, 758

24   F.3d 1154, 1158-59 (9th Cir. 2014); see also Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown,

25   520 U.S. 397, 410 (1997) (explaining that a plaintiff must offer "proof that a municipal actor

26   disregarded a known or obvious consequence of his action."); Davis v. City of Ellensburg, 869

27

28
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

1  F.2d 1230, 1235 (9th Cir. 1989) (holding that the "mere negligence" of a state official is

2  insufficient to confer liability).

3       Additionally, the inadequacy of training or supervision complained of must be causally

4  connected to the ultimate constitutional injury alleged.  See City of Canton, 489 U.S. at 391.  That

5  is, for liability to arise, a plaintiff must show (1) that she suffered a violation of her constitutional

6  rights; (2) that the alleged deficiency in training actually caused the constitutional violation at

7  issue; and (3) that the violation "would have been avoided had the employees been properly

8  trained." Id. at 389–91.

9       Plaintiffs argue that they have "overwhelming evidence that Traw does not have the

10  required skills to be an effective nurse or nurse manager."  Opp. at 25.  In support of this,

11  Plaintiffs cite to Traw's deposition testimony where she states that she had no training on what

12  due process is, what "protected activity" is, or whether public employees have the right to speak

13  out on matters of public concern.[13] Id.; Bonner Decl. at Ex. 2, 227:12- 228:20; 360:6-23, 380:21-

14  385:8.  Defendants do not dispute this, but rather move to dismiss on the grounds that Plaintiffs

15  fail to establish that they suffered a violation of a constitutional right, and even if they did, their

16  claim fails because Plaintiffs do not identify any policy, practice, or conscious decision that caused

17  the violation.  Mot. at 14.  Additionally, Defendants' offer undisputed evidence that Traw received

18  training regarding the County's policy on discrimination and how to investigate claims brought

19  under the policy.  C. Bonner Decl. at Ex. 1, 27:20-28:14; 69:9-19.

20       As an initial matter, although Plaintiffs ostensibly bring this cause of action against all

21  defendants, they fail to present any argument, let alone evidence, indicating that defendants

22  Banuelos or Hughes were involved in the hiring, training, supervision or retention policies at the

23  SCVMC or the MICC.  See Opp. at 24-26.  Accordingly, the court agrees with Defendants that

24

---

25  [13] Though not clearly or expressly stated, the court infers from these allegations that the purported
   constitutional violation Plaintiffs claim to have suffered is the discipline they received for
26  expressing their concerns regarding the hiring of male nurses, which they contend is protected
   activity.  See Opp. at 25.

27

28  Case No.: 5:11-cv-05643-EJD
   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
   SUMMARY JUDGMENT

1   summary judgment is appropriate as to Banuelos and Hughes.

2       As to the County, Traw's testimony that she received no training on specific issues such as

3   due process or what constitutes a protected activity is insufficient to establish municipal liability

4   under a failure to train theory.[14]  Facts showing how a particular policy could be improved or that

5   the County's training practices may not be ideal does not rise to the level of deliberate

6   indifference.  See Price, 513 F.3d at 973 (affirming the district court's grant of summary

7   judgment, despite the city's arguably flawed training policies, because the plaintiff could not show

8   deliberate indifference).  Plaintiffs fail to offer any evidence of a "conscious" or "deliberate"

9   decision by the County that did, or was likely to, "result in the violation of [Plaintiffs']

10  constitutional rights."  See City of Canton, 489 U.S. at 390.  Nor do Plaintiffs provide evidence of

11  a pattern of similar violations by other municipal employees that could show that "the need for

12  more or different training" was "so obvious" that the County's inaction amounted to a conscious

13  failure to act.  See id.; Connick v. Thompson, 563 U.S. 51, 62 (2011) (noting that "a pattern of

14  similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate

15  deliberate indifference.").  Accordingly, the court finds that as a matter of law there is insufficient

16  evidence of deliberate indifference on the part of the County to establish liability.

17      As to Traw, Plaintiffs similarly fail to establish that Traw acted with deliberate indifference

18  in her investigation or discipline of Plaintiffs.  See Davis, 869 F.2d at 1235.  The testimony

19  submitted by Plaintiffs shows, at best, that Traw lacked personal knowledge of certain legal

20  definitions or policy provisions such that she may have been mistaken or negligent in the

21  execution of her duties.  See C. Bonner Decl. at Ex. 1, 27:20-28:14; 69:9-19; Ex. 2, 227:12-

22  228:20; 360:6-23, 380:21- 385:8.  However, "mere negligence" is insufficient.  See Davis, 869

23  F.2d at 1235.  Plaintiffs neither offer admissible evidence that Traw was deliberately indifferent to

24  the need to train or supervise her subordinates, nor do they show how any purported lack of

[14] Additionally, none of Plaintiffs' claims allege the denial of due process.  Therefore, evidence that Traw received no training on due process is unhelpful and generally irrelevant.

1   training or supervision caused Plaintiffs to suffer a constitutional harm.  See Flores, 758 F.3d at

2   1159; Connick 563 U.S. at 58-60.  Based on this evidence, the court finds that no reasonable jury

3   could determine that Traw's actions amounted to a practice of deliberate indifference.

4      For the foregoing reasons, Defendants motion for summary judgment on Plaintiffs' Tenth

5   Cause of Action is GRANTED as to all Defendants.

6   **F.    Retaliation Under California Labor Code § 1102.5**

7      Defendants move for summary judgment on Plaintiffs' causes of action for retaliation in

8   violation of Labor Code § 1102.5.  Specifically, Defendants argue that Plaintiffs cannot produce

9   evidence of conduct falling under the relevant provision of the statute.  Because it would be

10   Plaintiffs' burden to prove these causes of action, they must first come forward with admissible

11   evidence to show there is a genuine dispute for trial.  Celotex Corp., 477 U.S. at 323-24.

12      "Labor Code section 1102.5 is a whistleblower statute, the purpose of which is to

13   'encourag[e] workplace whistle-blowers to report unlawful acts without fearing retaliation.'"

14   Soukup v. Law Offices of Herbert Hafif, 39 Cal. 4th 260, 287 (2006) (quoting Green v. Ralee

15   Eng'g Co., 19 Cal. 4th 66, 77 (1998)).  Although Plaintiffs cite to more in their amended

16   complaint, they focus only on one subsection of § 1102.5 in their opposition.  At the time this case

17   was filed, subsection (c) of § 1102.5 stated that "[a]n employer may not retaliate against an

18   employee for refusing to participate in an activity that would result in a violation of state or federal

19   statute, or a violation or noncompliance with a state or federal rule or regulation."  Cal. Lab. Code

20   § 1102.5(c) (effective January 1, 2004, to December 31, 2013).

21      To prove a violation of § 1102.5, "the plaintiff is required to first establish a prima facie

22   case of retaliation."  Mokler v. Cnty. of Orange, 157 Cal. App. 4th 121, 138 (2007).  In doing so,

23   "a plaintiff must show that he or she was subjected to adverse employment action after engaging

24   in protected activity and that there was a causal connection between the two."  Hansen v. Dep't of

25   Corrections & Rehabilitation, 171 Cal. App. 4th 1537, 1546 (2008).  "Protected activity is the

26   disclosure of or opposition to 'a violation of state or federal statute, or a violation or

27

28   

United States District Court
Northern District of California

1    noncompliance with a state or federal rule or regulation.'" Edgerly v. City of Oakland, 211 Cal.

2    App. 4th 1191, 1199 (2012).  "In other words, '[s]ection 1102.5 of the Labor Code requires that to

3    come within its provisions, the activity disclosed by an employee must violate a federal or state

4    law, rule or regulation.'"  Id. (quoting Mueller v. Cnty. of Los Angeles, 176 Cal. App. 4th 809,

5    821-22 (2009)).

6          Here, Plaintiffs explain that their respective § 1102.5 causes of action are based on their

7    opposition to Defendants' decision to employ male nurses in the post-partum unit, which they

8    claim was "founded" on their reluctance to compromise patients' "substantive due process right to

9    bodily integrity" as well as their "personal privacy under the Fourth Amendment and sexual and

10   gender discrimination."  But assuming the opposition to male nurses constitutes "refusing to

11   participate in an activity," Plaintiffs' reliance on general constitutional doctrines is nevertheless

12   insufficient to establish a prima face case of retaliation as required for claims under § 1102.5(c).

13   Mokler, 157 Cal. App. 4th at 138.  Indeed, Plaintiffs fail to convincingly identify which state or

14   federal statute or regulation prohibited the employment of male nurses in the post-partum unit,

15   such that their opposition to the practice constituted protected activity.  Edgerly, 211 Cal. App. 4th

16   at 1199.

17         Because Plaintiffs did not state the requisite prime facie case of retaliation, they have not

18   met their burden to show a genuine dispute for trial.  Accordingly, the court need not proceed to an

19   analysis of Defendants' non-discriminatory reasons.  The motion for summary judgment is

20   GRANTED as to the twelfth, fourteenth and fifteenth causes of action asserting violations of §

21   1102.5.

22       **G.     Retaliation Under California Health and Safety Code § 1278.5**

23         Defendants argue that Plaintiffs cannot establish causes of action for violation of Health &

24   Safety Code § 1278.5.  That statute "declares a policy of encouraging workers in a health care

25   facility, including members of a hospital's medical staff, to report unsafe patient care."  Fahlen v.

26   Sutter Central Valley Hosps., 58 Cal. 4th 655, 660-61 (2014).  Its whistleblower protections

27

28
     Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

"apply primarily to issues relating to the care, services, and conditions of a facility and are not intended to conflict with existing provisions in state and federal law relating to employee and employer relations."  Cal. Health & Safety Code § 1278.5(a)

Other provision of §1278.5 provide, in pertinent part:

> No health facility shall discriminate or retaliate, in any manner, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person has done either of the following:
>
> (A) Presented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity.
>
> (B) Has initiated, participated, or cooperated in an investigation or administrative proceeding related to, the quality of care, services, or conditions at the facility that is carried out by an entity or agency responsible for accrediting or evaluating the facility or its medical staff, or governmental entity.

Cal. Health & Safety Code § 1278.5(b)(1).

Much like § 1102.5, a plaintiff asserting a violation of § 1278.5 must establish a prima facie case of retaliation.  Jadwin v. Cnty. of Kern, 610 F. Supp. 2d 1129, 1144 (E.D. Cal. Apr. 8, 2009) ("To establish a prima facie case of retaliation under § 1278.5, a plaintiff must show that: (1) he engaged in protected activity under the statute; (2) he was thereafter subjected to an adverse employment action; and (3) a causal link between the two."); Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1105 (9th Cir. 2008).  "Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action."  Brooks, 229 F.3d at 928.  "Once the employer carries this burden, the plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext."  Id.

### i.    Prima Facie Case

#### a.    *Male Nurses in the MICC*

Plaintiffs contend that Defendants subjected each of them to retaliation in violation of § 1278.5 with regard to the hiring of male nurses in the MICC.  To that end, they argue in their

45

1    opposition brief that "Plaintiffs were informed by their patients, who having just given birth,

2    stated they did not feel safe having male nurses perform genital care for them" and that they

3    "informed the administration of their patient's safety and care concerns."

4         As to Smith, the record includes evidence showing that on February, 25, 2011, she asked

5    Dr. Byrne, the chief of the Maternal Child Health Division, about his thoughts concerning the

6    prospect of male nurses providing direct care to patients in the MICC.  Smith Decl., at ¶ 10.  Smith

7    states she made this inquiry out of a concern "about how this would impact patient safety, care and

8    choice."  Id. at ¶ 9.  She also states that Traw, in response to her conversation with Dr. Byrne,

9    issued her an "Employee Unfavorable Report" on March 15, 2011, stating that Smith's statements

10   were a violation of the County's policy against discrimination, harassment and retaliation.  Id. at ¶

11   16; Ex. 2.

12        As to Chambers, the record includes evidence showing she was involved in a conversation

13   in mid-February 2011 during which MICC nurses discussed the impact male nurses would have

14   on patient care and safety.  Chambers Decl., at ¶¶ 13-15.  Thereafter, on March 2, 2011, Chambers

15   and the other MICC nurses raised their safety concerns with Johnson, but Johnson was unwilling

16   to listen.  Id. at ¶ 15.  Chambers then received an Employee Unfavorable Report from Traw stating

17   she had engaged in sexual harassment and gender discrimination.  Id. at ¶ 18, Ex. 2.

18        But as to Shumaker, the record does not show she engaged in protected activity concerning

19   male nurses working in the MICC, despite the reference to all named plaintiffs in their argument.

20   In fact, Shumaker testified she did not raise the issue with anybody in management.  Sandoval

21   Decl. at Ex B, 117:24-118:3.  Accordingly, the court finds on this evidence that only Smith and

22   Chambers have met their burden to demonstrate a prima facie case of retaliation on the issue of

23   male nurses.

24                    *b.  Patient Assignments*

25        Plaintiffs argue further that Smith experienced retaliation in violation of § 1278.5 after

26   complaining about her patient assignments.  Specifically, they argue in their opposition brief that

27

28
     Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

1    Smith, "who was assigned six patients with the highest acuity levels, complained to Defendant

2    Traw that she felt such an assignment was unsafe as it entailed too many high priority patients for

3    one nurse," but that Traw "wrote Smith up for complaining about a situation where an HSA failed

4    to respond to a patient in need."

5         This argument is supported by the record.  Plaintiffs have produced evidence showing that

6    on May 17, 2011, Smith spoke with Traw about her assignment to six patients, half of which had

7    the highest acuity level.  Smith Decl., at ¶ 22.  Smith states she spoke to Traw because she

8    considered the assignment to be unsafe.  Id.  In response, Traw issued Smith a written counseling

9    letter on June 8, 2011, in which Smith was told to stop complaining about assignments.  Id. at

10   ¶ 23.

11        The court finds based on this evidence that Smith has met her burden to demonstrate a

12   prima facie case of retaliation on the issue of patient assignments.

13            **ii.    Legitimate Reasons**

14        The burden now shifts to Defendants to present legitimate reasons for the adverse

15   employment actions taken against Smith and Chambers.  Brooks, 229 F.3d at 928.

16        Here, as already discussed, the evidence shows that Traw issued the Employee

17   Unfavorable Reports to Smith and Chambers based on perceived violations of the anti-

18   discrimination policy.  Furthermore, the evidence shows that Traw issued the written counseling to

19   Smith based on information she received that Smith interrupted the charge nurse three times, and

20   that Smith had contributed to an "unharmonious work environment" by comparing her work

21   assignments to other nurses, acting unprofessionally, refusing to take breaks, and raising her voice

22   to colleagues.  Traw Decl., at ¶ 4; Ex. B.

23        On this record, Defendants have successfully rebutted the inference of retaliation with

24   legitimate reasons for the adverse employment actions.  Thus, the court finds they have satisfied

25   their burden on this level of the analysis.

26

27                                                          47

28   Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### iii.   Pretext

The burden now shifts back to Plaintiffs to demonstrate a genuine issue of material fact as to whether the reasons advanced by Defendants are pretext for retaliation.  Brooks, 229 F.3d at 928.

"Pretext may be shown either (1) directly by persuading the jury that a discriminatory motive more likely than not motivated the employer or (2) indirectly by showing that the employer's proffered explanation is unworthy of credence."  Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1284 (9th Cir. 2001).  However, if only circumstantial evidence is offered, "such evidence has to be 'specific' and 'substantial.'"  Id. (citing Godwin, 150 F.3d at 1222).  Moreover, "a plaintiff at the pretext stage must produce evidence in addition to that which was sufficient for her prima facie case in order to rebut the defendant's showing."  Id. at 1220.

Here, Plaintiffs have not produced evidence on which a reasonable jury could find that Defendants' proffered reasons are pretext for retaliation under § 1278.5 because, as the court has explained, nothing in the record shows that Traw did not honestly believe the information for which she disciplined Smith and Chambers.

In the absence of sufficient evidence to establish pretext, Defendants' motion for summary judgment is GRANTED as to the sixteenth and nineteenth causes of action asserting violations of § 1278.5 on behalf of Smith and Chambers.  The motion is also GRANTED on the eighteenth cause of action asserting a violation of § 1278.5 on behalf of Shumaker because Plaintiffs did not establish a prima facie case of retaliation for that claim.

### H.   Retaliation Based on Free Speech

Plaintiffs assert in the eleventh cause of action under § 1983 that Defendants retaliated against them for participating in speech protected by the First Amendment.  Defendants argue that Plaintiffs cannot prove their claim.  Defendants are correct.

"It is well settled that the state may not abuse its position as employer to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of

48

1    public interest.'" Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting Pickering v. Bd. of

2    Educ., 391 U.S. 563, 568 (1968)).  Courts employ a "sequential five-step series of questions"

3    when examining a public employee's First Amendment claim:

5    > (1) whether the plaintiff spoke on a matter of public concern; (2)
     > whether the plaintiff spoke as a private citizen or public employee;
6    > (3) whether the plaintiff's protected speech was a substantial or
     > motivating factor in the adverse employment action; (4) whether the
7    > state had an adequate justification for treating the employee
     > differently from other members of the general public; and (5)
8    > whether the state would have taken the adverse employment action
     > even absent the protected speech.

9    Id.

10   A plaintiff's failure to satisfy any single step ends the inquiry.  Johnson v. Poway Unified

11   Sch. Dist., 658 F.3d 954, 961-62 (9th Cir. 2011) (citing Huppert v. City of Pittsburg, 574 F.3d

12   696, 703 (9th Cir. 2009)).

13                  **i.    Matter of Public Concern**

14       On the first step, "the plaintiff bears the burden of showing that the speech addressed an

15   issue of public concern." Eng, 552 F.3d at 1070.  Ultimately, the question of whether a statement

16   constitutes a matter of public concern is not subject to "rigid, multi-part tests;" instead, "the

17   content, form, and context of a given statement, as revealed by the whole record" must be

18   reviewed.  Clairmont v. Sound Mental Health, 632 F.3d 1091, 1103 (9th Cir. 2011).  Based upon a

19   "generalized analysis of the nature of the speech," a statement can be placed "on a continuum

20   ranging from matters of public concern to matters of purely personal concern."  Id.  "Whether an

21   employee's speech involves a matter of public concern is a question of law." Roth v. Veteran's

22   Admin. of Gov't of U.S., 856 F.2d 1401, 1405-06 (9th Cir. 1988), overruled on other grounds by

23   Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).

24       Plaintiffs argue that Smith's statement to Dr. Byrne concerning the prospect of male nurses

25   working in the MICC, as well as Chambers' statement to Johnson on that same subject, can each

26   be classified as speech on a matter of public concern because they constituted speech related to

*United States District Court*
*Northern District of California*

49

1   patient safety rather than complaints about workplace policies.  Placing these statements on the

2   continuum described by the Ninth Circuit and in consideration of the record as a whole, the court

3   agrees with Plaintiffs.  See Hyland v. Wonder, 972 F.2d 1129, 1137 (9th Cir. 1992) (holding the

4   exposure of "threats to public safety" constitutes a matter of public concern); see also Roth, 856

5   F.2d at 1406 (holding that hospital employee spoke on matters of public concern when he alleged

6   administrators and staff "wasted resources, acted unethically, mismanaged personnel, and violated

7   safety regulations, thereby putting patients in jeopardy").

8        Plaintiffs also argue that Smith and Chambers engaged in speech on a matter of public

9   concern when they spoke out about allegedly discriminatory work assignments.  It is generally

10  true that "speech alleging that the government engaged in discrimination or other civil rights

11  violations is on a matter of public concern," (Clairmont, 632 F.3d at 1104), and the record shows

12  that Smith complained to both Traw and Johnson about possible discrimination by Ablan.  Smith

13  Decl., at ¶ 28c; C. Bonner Decl. at Ex. B, 399:18-400:19.  However, the record also shows that

14  Smith only presented these statements to individuals in her supervisory chain of command, in the

15  same way she presented prior complaints on issues other than discrimination, such as being denied

16  breaks and improper patient ratios.  C. Bonner Decl. at Ex. 2, 396:24-399:12; Smith Decl. ¶ 28(b),

17  Ex. 6.  This observation is important here, because "[w]hen a public employee's contested speech

18  occurs in the context of an internal power struggle or personal employment grievance, this will

19  militate against a finding of public concern."  Clairmont, 632 F.3d at 1104.  "When employee

20  speech concerning office policy arises from an employment dispute concerning the very

21  application of that policy to the speaker, additional weight must be given to the supervisor's view

22  that the employee has threatened the authority of the employer to run the office."  Connick v.

23  Myers, 461 U.S. 138, 153 (1983).  Accordingly, the court finds that Smith's statements to Traw

24  and Johnson addressing possible discrimination in work assignments were not made on a matter of

25  public concern.  Furthermore, other than evidence demonstrating that Chambers reviewed the

26  schedule with Smith on June 21, 2011, Plaintiffs have not cited to any portion of the record

27

28
Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

1    showing that Chambers actually made a statement to anyone concerning discriminatory

2    assignments.  Thus, they have not met their burden to show that Chambers engaged in speech on

3    that issue.

4    　　　Based on this discussion, the court finds that Smith and Chambers only spoke on a matter

5    of public concern regarding the employment of male nurses in the MICC.

6    　　　　　**ii.　　Private Citizen or Public Employee**

7    　　　Plaintiffs must also bear the burden on the second step, which requires "showing the

8    speech was spoken in the capacity of a private citizen and not a public employee." Eng, 552 F.3d

9    at 1071.  The issue is a mixed question of law and fact and involves two inquiries. Johnson, 658

10   F.3d at 966.  "First, a factual determination must be made as to the 'scope and content of a

11   plaintiff's job responsibilities.'" Id.  "Second, the 'ultimate constitutional significance' of those

12   facts must be determined as a matter of law." Id.  "[S]tatements are made in the speaker's

13   capacity as citizen if the speaker 'had no official duty' to make the questioned statements . . . or if

14   the speech was not the product of 'perform[ing] the tasks [the employee] was paid to perform.'"

15   Posey v. Lake Pend Oreille School Dist. No. 84, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) (quoting

16   Marable v. Nitchman, 511 F.3d 924, 932-33 (9th Cir. 2007), Freitag v. Ayers, 468 F.3d 528, 544

17   (9th Cir. 2006)); see Myers, 461 U.S. at 147 (holding there is no First Amendment protection

18   "when a public employee speaks not as a citizen upon matters of public concern, but instead as an

19   employee upon matters only of personal interest").

20   　　　Although they argue something different, Plaintiffs have not shown their speech

21   concerning make nurses working in the MICC, or any part it, was made by Smith and Chambers in

22   their capacities as private citizens.  As to the statements about male nurses working in the MICC -

23   which Plaintiffs themselves classify as a patient safety issue - there is no dispute either in the

24   evidence or in the parties' arguments that one of Plaintiffs' job duties was to convey patient

25   complaints and preferences to management.  Sandoval Decl. at Ex. A, 71:2-21; Ex. F, 188:21-

26   189:12.  Moreover, there is no evidence to support Plaintiffs' argument that Smith and Chambers

27

28   Case No.: 5:11-cv-05643-EJD
　　ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
　　SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1    stepped outside of their professional roles and advocated for the rights of women generally.

2    Consequently, the court finds that Smith and Chambers made the statements about male nurses

3    while performing the tasks of public employees.

4           And while it is not necessary to address the discriminatory work assignments further, it is

5    nonetheless notable that Plaintiffs provide no argument and cite to no evidence showing that

6    Smith was acting as a private citizen as opposed to a publicly-employed nurse when she made

7    statements on that subject to Johnson and Traw.  Thus, the court finds that Smith made the

8    statements about discriminatory work assignments as a public employee and not as a private

9    citizen.

10          Since Plaintiffs did not put forward evidence and arguments establishing they spoke as

11   private citizens, the court need not proceed with the remaining steps of the analysis.  Johnson, 658

12   F.3d at 961-62.  Defendants' motion for summary judgment on the eleventh cause of action is

13   GRANTED because a reasonable jury could not find in their favor.  Nissan Fire & Marine Ins.

14   Co., 210 F.3d at 1103.

15          **I.     Retaliation Based on Free Speech Under Monell**

16          In the twenty-second cause of action asserted against all defendants, Plaintiffs allege the

17   County violated § 1983 through "a custom, practice and policy of retaliation, sham HIPAA

18   violations investigations, and sham peer reviews against medical providers and employees who

19   exercise their First Amendment Rights of Free Speech and Right to Petition the government."

20   Defendants argue Plaintiffs cannot establish this claim with admissible evidence.

21          Under these circumstances, liability under § 1983 requires that an "action pursuant to

22   official municipal policy of some nature cause a constitutional tort."  Monell v. Dep't of Soc.

23   Servs. of City of N.Y., 436 U.S. 658, 691 (1978).  A plaintiff must "demonstrate that, through its

24   deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  Bd. of

25   Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 404 (1997).  Thus, to establish a

26   claim under Monell, a plaintiff must prove either (1) a municipal employee "committed the

27

28   Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

52

1    alleged constitutional violation pursuant to a formal governmental policy or a longstanding

2    practice or custom," (2) "the individual who committed the constitutional tort was an official with

3    'final policy-making authority,'" or (3) "an official with final policy making authority ratified a

4    subordinate's unconstitutional decision or action and the basis for it."  Gillette v. Delmore, 979

5    F.2d 1342, 1346-47 (9th Cir. 1992).

6        Here, Plaintiffs plainly fail to satisfy their burden to produce evidence creating a genuine

7    issue of material fact on the Monell claim.  Nissan Fire & Marine Ins. Co., 210 F.3d at 1103.

8    They merely argue that "disputed issues of material fact show that Defendants had a policy or

9    custom which was the moving force behind the harms incurred by Plaintiffs," and cite only to

10   instances in the record they believe show that Traw and Johnson did not investigate concerns

11   about male nurses in the MICC due to a "policy that the issue of male nurses could not be

12   discussed."  However, they cite to no evidence establishing that Traw and Johnson were officials

13   with final policy making authority, or that the alleged policy prohibiting discussion of male nurses

14   violated their constitutional rights.

15       In the absence of any evidence upon which a jury could find liability under Monell,

16   Defendants' motion for summary judgment is GRANTED on the twenty-second cause of action.

17       **J.    State Law Tort Claims**

18       Plaintiffs' twentieth and twenty-first causes of action assert state law tort claims for

19   invasion of privacy against Traw and intentional infliction of emotional distress ("IIED") against

20   all defendants.  As an initial matter, Defendants argue that Plaintiffs cannot prove either of these

21   claims against Banuelos because they have not shown Banuelos took any action against them.

22   Given that Plaintiffs mention Banuelos only once in their opposition brief and do not cite to facts

23   in the record describing adverse actions for which he is responsible, the court finds that Plaintiffs

24   failed to produce sufficient evidence to establish either cause of action against Banuelos.

25       This leaves Traw, Hughes and the County.  As to them, Defendants assert they are entitled

26   to summary judgment because Traw and Hughes are immune from individual liability pursuant to

27

28   Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

53

United States District Court
Northern District of California

United States District Court
Northern District of California

1    California Government Code §§ 820.2 and 821.6.  And if an employee is immune under §§ 820.2

2    or 821.6, the County is immune as well.  Gov. Code § 815.2(b); Kemmerer v. Cty. of Fresno, 200

3    Cal. App. 3d 1426, 1435 (1988).

4         Under § 820.2, "a public employee is not liable for an injury resulting from his act or

5    omission where the act or omission was the result of the exercise of the discretion vested in him,

6    whether or not such discretion be abused."  Cal. Gov't Code § 820.2.  Whether an act or omission

7    in dispute is considered "discretionary" for immunity purposes generally turns on whether the

8    relevant decision involves "planning and policymaking," or is simply a "ministerial" execution of

9    one's duties.  Nasrawi v. Buck Consultants LLC, 231 Cal. App. 4th 328, 341 (2014), review

10   denied (Feb. 25, 2015); Martinez v. City of Los Angeles, 141 F.3d 1373, 1379 (9th Cir. 1998)

11   ("[I]mmunity protects 'basic policy decisions,' but does not protect 'operational' or 'ministerial'

12   decisions that merely implement a basic policy decision.") (quoting Johnson v. State of California,

13   69 Cal. 2d 782, 796 (1968)); Caldwell v. Montoya, 10 Cal. 4th 972, 981, (1995) (explaining that

14   "there is no basis for immunizing lower-level, or 'ministerial,' decisions that merely implement a

15   basic policy already formulated.").

16        Section 821.6 extends immunity to public employees for actions taken in preparation for

17   formal proceedings, including actions related to investigations.   Paterson v. City of Los Angeles,

18   174 Cal. App. 4th 1393, 1405 (2009). Under § 821.6, "[a] public employee is not liable for injury

19   caused by his instituting or prosecuting any judicial or administrative proceeding within the scope

20   of his employment, even if he acts maliciously and without probable cause."  Cal. Gov't Code §

21   821.6.  California courts interpret § 821.6 broadly "in furtherance of its purpose to protect public

22   employees in the performance of their prosecutorial duties from the threat of harassment through

23   civil suits."  Gillan v. City of San Marino, 147 Cal. App.4th 1033, 1048 (2007).  Consequently,

24   courts have construed § 821.6 to include actions taken in conjunction with a variety of disciplinary

25   proceedings.  See, e.g., Kayfetz v. State of California, 156 Cal. App. 3d 491, 494-96 (1984)

26   (affirming the trial court's grant of § 821.6 immunity where the plaintiff, a doctor, sued the State

27

28
54

1    of California and various medical entities and administrators for damages arising from the

2    publication of disciplinary actions taken against him because the publication was "an integral part"

3    of the disciplinary process); <u>Citizens Capital Corp. v. Spohn</u>, 133 Cal. App. 3d 887, 889 (1982)

4    (upholding the grant of § 821.6 immunity for defendants in a collection agency license revocation

5    proceeding who publicly reported the results of their official investigation); <u>Kemmerer</u>, 200 Cal.

6    App. 3d at 1436 (applying § 821.6 immunity to public service employees of social services

7    department for investigation and initiation of formal disciplinary proceedings); <u>cf.</u> <u>Blankenhorn</u>,

8    485 F.3d at 488 (holding that police officers were not immune for acts undertaken during the

9    arrest, rather than the investigation, of the plaintiff).

10        Because immunity is a fact-specific inquiry that turns on the underlying acts of the

11   employee, it will be addressed as to each cause of action individually.

12                    **i.    Intentional Infliction of Emotional Distress**

13        To support a claim for IIED, a plaintiff must show the following elements: "(1) extreme

14   and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the

15   probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional

16   distress; and (3) actual and proximate causation of the emotional distress by the defendant's

17   outrageous conduct." <u>Potter v. Firestone Tire & Rubber Co.</u>, 6 Cal. 4th 965, 1001 (1993) (internal

18   quotations omitted).  Conduct is "outrageous" if it is "so extreme as to exceed all bounds of that

19   usually tolerated in a civilized community." <u>Id.</u>

20        Here, Plaintiffs base their IIED claim on the same actions that underlie their claims for

21   retaliation.  Opp. at 33 ("[I]t is the retaliation itself that rises to the level of extreme and

22   outrageous.").  But as has been explained, only Chambers' causes of action for retaliation based on

23   the HIPAA investigation and the schedule change survive this motion.  Thus, Defendants are

24   entitled to summary judgment on Smith and Shumaker's IIED claims.

25        As to Chambers, the court finds that Hughes is entitled to immunity under § 821.6 for her

26   conduct related to the HIPAA investigation.  Notably, Plaintiffs do not address this statute in their

United States District Court
Northern District of California

27

28
Case No.: 5:11-cv-05643-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

1    opposition.

2         Traw, however, is not entitled to immunity under §§ 820.2 or 821.6 for the schedule

3    change because the activity of arranging employee schedules does not fall within the ambit of

4    either section.  In any event, Plaintiffs have not produced sufficient evidence to sustain a finding

5    that Traw's conduct with respect to schedule change is so extreme and outrageous "as to exceed

6    all bounds of that usually tolerated in a civilized community."  Potter, 6 Cal. 4th at 1001; see

7    Berkley v. Dowds, 152 Cal. App. 4th 518, 534 (2007) ("Whether a defendant's conduct can

8    reasonably be found to be outrageous is a question of law that must initially be determined by the

9    court[.]").  For these reasons, Defendants' motion for summary judgment on the twenty-first cause

10   of action is GRANTED.[15]

11        **ii.    Invasion of Privacy**

12        Smith and Chambers contend that Traw invaded their privacy by publically posting the

13   nurses' schedules, which included information showing that Smith and Chambers were required to

14   attend mandatory sexual harassment trainings.  In response, Defendants assert that Traw's action

15   in posting the schedules was routine, that Plaintiffs had no reasonable expectation of privacy in

16   their schedules, and even if they did, they failed to establish any invasion of that privacy by

17   Defendants.  Mot. at 33.

18        On the issue of immunity, and by Defendants' own representations, the act of posting

19   nurses' schedules was a routine, common practice in the MICC, rather than a discretionary policy

20   decision.  See Mot. at 33; Sandoval Decl. at Ex. A, 172:23-173:9.  Accordingly, the court finds

21   that Traw is not entitled to immunity under § 820.2.  Martinez, 141 F.3d at 1379.

22        Turning next to the merits of the claim itself, the court finds that Plaintiffs failed to satisfy

23   their burden to show an invasion of privacy.  In order to prevail on cause of action for invasion of

24

25   _____

     [15] For similar reasons, Plaintiffs cannot sustain their request for punitive damages against Traw.
26   Cal Civ. Code. § 3294(a) (providing that punitive damages are only awarded "where it is proven
     by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or
27   malice").  Defendants are therefore entitled to summary judgment on the request.

28                                              56
     Case No.: 5:11-cv-05643-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

privacy, a plaintiff must establish: (1) a legally protected interest; (2) a reasonable expectation of privacy; and (3) conduct by defendants constituting a serious invasion of privacy.  <u>Loder v. City of Glendale</u>, 14 Cal. 4th 846, 890-891 (1997).

According to Traw, the posting of the nurses' schedules, including which nurses were attending which classes, was a regular occurrence and was typically done to help remind nurses about the dates and times of their trainings - not to publicize disciplinary actions.  Sandoval Decl. at Ex. A, 172:23-173:9.  Moreover, Smith admitted that the nurses' schedules might routinely include the name of a class and as well as who was attending.  <u>Id.</u> at Ex. F, 243:13-23.  On this evidence, Defendants conclude that because this behavior was consistent and routine, Plaintiffs had no reasonable expectation of privacy.  Mot. at 33.

Smith and Chambers counter that the publication could be routine and still violate their expectation of privacy.  Opp. at 35.  They argue that by publishing the fact that they were attending sexual harassment training, Traw "effectively disclosed that plaintiffs were issued some sort of Unfavorable Report pertaining to some discrimination policy breach," which they contend is private information "undoubtedly" included in their personnel files.  <u>Id.</u>

However, while it is true that employees may have a reasonable expectation of privacy in certain information contained in their personnel files, Plaintiffs offer no actual evidence demonstrating what substantive information contained in their files was disclosed by the routine posting of their work and training schedules.  That is, even if the court were to accept Plaintiffs' theory that the mere publication of Smith and Chambers' attendance at these trainings could be construed as a reflection of disciplinary actions against them, Plaintiffs do not offer any evidence showing that such information was contained in their personnel files, or any other evidence upon which the court could find that Plaintiff's had a reasonable expectation of privacy in the information included in their schedules.  <u>See</u> Opp. at 35.

Accordingly, the court finds that Plaintiffs have failed to demonstrate that they had a reasonable expectation of privacy in the information reflected in the publicized schedules or that

Case No.: <u>5:11-cv-05643-EJD</u>
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Traw "seriously invaded" this expectation when she published them. Defendants' motion for summary judgment is therefore GRANTED with respect to Smith and Chambers' invasion of privacy claim.

## IV.  CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment (Dkt. No. 49) is GRANTED IN PART and DENIED IN PART as follows:

1.  The motion is GRANTED as to the first cause of action asserting violations of Title VII and FEHA (discrimination-disparate treatment) on behalf of Smith.

2.  The motion is GRANTED as to the third cause of action asserting violations of Title VII and FEHA (discrimination-disparate treatment) on behalf of Shumaker.

3.  As to the fourth cause of action asserting violations of Title VII and FEHA (discrimination-disparate treatment) on behalf of Chambers, the motion is DENIED to the extent it is based the HIPAA investigation. The motion is GRANTED as to all other bases for the cause of action.

4.  The motion is GRANTED as to the fifth cause of action asserting violations of Title VII and FEHA (discrimination-disparate impact) on behalf of Smith.

5.  The motion is GRANTED as to the seventh cause of action asserting violations of Title VII and FEHA (discrimination-disparate impact) on behalf of Shumaker.

6.  The motion is GRANTED as to the eighth cause of action asserting violations of Title VII and FEHA (discrimination-disparate impact) on behalf of Chambers.

7.   As to the ninth cause of action asserting retaliation in violation of FEHA, the motion is DENIED as to Chambers to the extent it is based on the HIPAA investigation and the denial of her schedule change request. The motion is GRANTED as to all other bases for the cause of action on behalf of all Plaintiffs.

8.  The motion is GRANTED as to the tenth cause of action asserting negligent hiring, supervision and retention (42 U.S.C. § 1983) on behalf of all Plaintiffs.

United States District Court
Northern District of California

1    9.   The motion is GRANTED as to the eleventh cause of action asserting retaliation for

2  exercising free speech (42 U.S.C. § 1983) on behalf of all Plaintiffs.

3    10. The motion is GRANTED as to the twelfth cause of action asserting retaliation in violation

4  of California Labor Code § 1102.5 on behalf of Smith.

5    11. The motion is GRANTED as to the fourteenth cause of action asserting retaliation in

6  violation of California Labor Code § 1102.5 on behalf of Shumaker.

7    12. The motion is GRANTED as to the fifteenth cause of action asserting retaliation in

8  violation of California Labor Code § 1102.5 on behalf of Chambers.

9    13. The motion is GRANTED as to the fourteenth cause of action asserting retaliation in

10 violation of California Health & Safety Code § 1278.5 on behalf of Smith.

11   14. The motion is GRANTED as to the eighteenth cause of action asserting retaliation in

12 violation of California Health & Safety Code § 1278.5 on behalf of Shumaker.

13   15. The motion is GRANTED as to the nineteenth cause of action asserting retaliation in

14 violation of California Health & Safety Code § 1278.5 on behalf of Chambers.

15   16. The motion is GRANTED as to the twentieth cause of action asserting invasion of privacy

16 on behalf of Smith and Chambers.

17   17. The motion is GRANTED as to the twenty-first cause of action asserting intentional

18 infliction of emotional distress on behalf of all Plaintiffs.

19   18. The motion is GRANTED as to the twenty-second cause of action asserting a violation of

20 42 U.S.C. § 1983 (Monell) on behalf of all Plaintiffs.

21   19. The motion is GRANTED as to Plaintiffs' request for punitive damages.

22

23       **IT IS SO ORDERED.**

24 Dated:  August 1, 2016

25                                        _____

26                                        EDWARD J. DAVILA
                                         United States District Judge

27                                    59

United States District Court
Northern District of California